**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

No. 95-50705
(Summary Calendar)

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WILLIAM N. GREULING, JR.,

Defendant-Appellant.

---

Appeal from the United States District Court
for the Western District of Texas
(EP-94-CR-385-H)

---

August 1, 1996

Before JOLLY, JONES, and STEWART, Circuit Judges.

PER CURIAM:[*]

William N. Greuling, Jr., appeals from his conviction for aiding and abetting violations of the Federal Water Pollution Control Act, 33 U.S.C. § 1319(c)(2(A). He contends solely that the evidence was insufficient to support his conviction. We have reviewed the record and the briefs of the parties and hold that the evidence was sufficient for a reasonable jury to find Greuling guilty beyond a reasonable doubt.

---

[*]Pursuant to Local Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

**FACTS**

William Greuling, Jr. is the president and owner of thirty percent of the company stock of El Paso Plating Works, Inc., an electoplating business historically engaged in plating metal pieces produced by others for major car manufacturers. In 1994, Greuling and Ray Molina, vice-president, manager, and forty percent owner of stock, were charged in a twelve-count indictment with various violations of the Federal Water Pollution Control Act ("Clean Water Act"), 33 U.S.C. § 1319(c)(2)(A). The jury returned guilty verdicts against Greuling and Molina on most of the charges, but acquitted Greuling of the conspiracy charge. The district court sentenced Greuling to twenty-four months' imprisonment on each count, with the sentences running concurrently, and fined him $5,000. Greuling appeals challenging that the evidence was insufficient to support the jury's verdict.

**DISCUSSION**

The Government's theory was that Greuling knowingly violated the Clean Water Act by failing to end the discharge of wastewater from EPPW's plant into the El Paso sewer system, despite years of warnings from the Utility . To support a conviction of aiding and abetting under 18 U.S.C. § 2, the Government must prove that Greuling (1) intentionally and knowingly associated with a criminal venture, (2) participated in the venture, and (3) sought by his actions to make the venture succeed. United States v. Beuttenmuller, 29 F.3d 973, 981-82 (5th Cir. 1995). "Association means that the defendant shared the criminal intent of the principal. . . . Participation means that the defendant engaged in some affirmative conduct designed to aid the venture." United States v. Salazar, 66 F.3d 723, 729 (5th Cir. 1995) (citations omitted). To prove a violation of the Clean Water Act, the Government must show that the defendant knowingly violated a requirement imposed

2

in an EPA-approved pretreatment program by discharging wastewater containing pollutants into the El Paso sewer system.  See § 1319(c)(2)(A).

We find that the evidence was sufficient to support the jury's verdict.  Bruce Bradbury, the accountant and officer manager at EPPW, testified that Greuling controlled the financial decisions at the company.  The evidence showed that, although as plant manager Molina controlled operations at the EPPW plant, he did not have absolute authority.  Rather Molina needed Greuling's approval in decisions that exceeded the scope of day-to-day operations, especially decisions involving equipment purchases.

The evidence also showed that Greuling grew up in the electroplating business, as his father purchased EPPW when Greuling was a child.  Greuling had worked at the plant as a teenager, and he understood the chemicals used in the process and the chemicals present in the wastewater.  Additionally, Greuling admitted on cross examination that he had testified in an unrelated proceeding to explain how the electroplating process worked.

Further, the evidence showed that Greuling was well aware of the inadequate conditions at EPPW.  There was testimony that the plant's roof was in very poor condition, that it leaked excessively, and that water was routinely on the floor.  Bruce Freeman, the EPPW's sales manager, testified that the plant's roof leaked "like a sieve" and that Greuling visited the plant often, particularly when there were problems.  Other plant employees testified that they observed Greuling at the plant.  Molina and a fire marshal inspector both testified that Greuling was present at the plant on occasions when there was liquid on the floor.

The evidence showed that Greuling also was aware that, because of its poor condition, the EPPW plant had been discharging untreated wastewater into the El Paso sewer system for years.  The

3

Utility first issued EPPW a permit in 1984 that allowed the company to discharge wastewater from its plant into the city's sewer system, within certain federal and local pretreatment limits. From 1986 to 1988, EPPW was cited by the Utility for discharging wastewater into the sewer system in violation of the discharge limits set in its permit. Greuling responded by assuring the Utility that he was going to purchase the necessary equipment to treat the wastewater before it entered the sewer system. By 1989, EPPW's failure to comply with the regulations caused the Utility to list the company in the local newspaper as a "significant violator."

In 1990, the Utility continued to detect violations of discharge limits by the EPPW plant and continued to notify Greuling of the violations. In May 1990, Greuling attended a hearing concerning the repeated violations. After the hearing, Greuling signed a contract with the Utility assuring it that EPPW would cease all industrial discharges into the sewer system by December 14, 1990.

Between May 1990 and the December 1990 cut-off date, the Utility continued to monitor EPPW's discharges, and in response to Greuling's complaints about the Utility's sampling procedures, hired an independent contractor to collect the samples. Illegal discharges were detected in both July and December 1990. In January 1991, in a further effort to bring the company into compliance with the discharge limits, the Utility excavated the sewer lines outside of the EPPW plant and replaced them with new piping to protect against the possibility of metals leaking into the wastestream from corroded piping.

The evidence showed that Greuling understood that the plant needed wastewater treatment equipment and made promises to the Utility, prior to 1988, to install such equipment. As the years passed, Greuling repeatedly made similar representations to the Utility that enabled EPPW to continue operating, including multiple promises that the company would end the discharge problem

4

by disconnecting completely from the sewer system. Greuling failed to have EPPW disconnected completely from the sewer system. As a result, the improper discharging of untreated wastewater continued.

The evidence showed that, despite his extensive knowledge of the plant's ongoing inadequacies and despite his promises to correct them, Greuling refused to allocate money to repairing the plant and that he spent the funds EPPW collected for environmental cleanup on other things. The EPPW sales manager and the EPPW accountant both testified that the company was profitable, yet, according to Molina, Greuling told him that the company had no funds to spend on water-treatment equipment. The sales manager, Bruce Freeman, testified that, at one point, the company included a five-percent surcharge in its billings in order to acquire the funds needed to bring the plant into compliance with the law. He testified that Greuling sent a letter to EPPW's clients explaining that funds from the surcharge would be used to purchase water-treatment equipment and to otherwise update the plant's waste-disposal capabilities. Freeman testified:

> That 5 percent was supposed to be set in a separate bank account at the end of the month. If we had had, for round figures, a hundred thousand in billing, we'd probably have 42, $4500 that should go into a waste disposal account. And Bill [Greuling] and I had words several times about not -- that it was going into the general fund and not being used the way that we had told clients that it was going to be used.

Although Greuling did not participate physically in the discharging, as did other plant employees, including Molina, the evidence established that Greuling knew about the illegal discharging and that, as chief financial officer of the company, he possessed the exclusive ability to make the changes necessary to comply with the laws. "An aider and abettor is liable for the criminal acts that are the 'natural or probable consequence of the crime' that he counseled, commanded, or otherwise encouraged." United States v. Vaden, 912 F.2d 780, 783 (5th Cir. 1990) (citation

5

omitted).  Here, the discharge of wastewater from the EPPW plant was the natural and probable consequence of Greuling's exclusive management decisions.

Based on the evidence and testimony, a reasonable jury could have found beyond a reasonable doubt that Greuling aided and abetted in the illegal discharging of untreated wastewater from the EPPW plant.  See United States v. Bell, 678 F.2d 547, 549 (5th Cir. 1982)(en banc), aff'd, 462 U.S. 356 (1983).  The evidence was sufficient to support the jury's verdict.

## CONCLUSION

For the foregoing reasons, we AFFIRM Greuling's conviction.