# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
May 15, 2012

Lyle W. Cayce
Clerk

No. 11-30572

UNITED STATES OF AMERICA,

Plaintiff–Appellee

v.

J. JEFFREY PRUETT; LOUISIANA LAND & WATER COMPANY; L W C MANAGEMENT COMPANY, INCORPORATED,

Defendants–Appellants

Appeals from the United States District Court
for the Western District of Louisiana

Before KING, BARKSDALE, and PRADO, Circuit Judges.

PER CURIAM:

Defendants–Appellants J. Jeffrey Pruett, Louisiana Land & Water Co., and LWC Management, who own and operate numerous wastewater treatment facilities, were charged with knowingly violating the Clean Water Act. After a ten-day trial, Defendants–Appellants were convicted on multiple counts. They now appeal their convictions and sentences. For the reasons stated herein, we AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant–Appellant J. Jeffrey Pruett ("Pruett") was the president and chief executive officer of Defendants–Appellants Louisiana Land & Water Co.

No. 11-30572

("LLWC") and LWC Management Co., Inc. ("LWC Management"). Pruett, through LLWC and LWC Management, was responsible for the operation of twenty-eight wastewater treatment facilities in northern Louisiana.

Pruett's facilities treated and discharged wastewater, known as "effluent." Under the Clean Water Act ("CWA"), 33 U.S.C. § 1342, Pruett was required to obtain a National Pollutant Discharge Elimination System ("NPDES") permit for each wastewater treatment facility that he operated. Pruett obtained the required permits through the Louisiana Department of Environmental Quality ("LDEQ"), which administers the NPDES program in Louisiana. Among other things, the NPDES permits imposed "effluent limitations" on the discharge of certain pollutants from treatment facilities. Pruett was required to collect samples to ensure that effluent discharges from his facilities were within permit limits, and to regularly submit the test results, called Discharge Monitoring Reports, to the LDEQ. Pruett was also required to maintain detailed records of his monitoring activities and provide inspectors access to his records.

In November 2007, the Environmental Protection Agency ("EPA") and the LDEQ began a series of inspections at Pruett's facilities. Inspectors discovered violations at many of these facilities, six of which are at issue here: (1) Bayou Galion, (2) Charmingdale, (3) Donovan Woods and Daywood, (4) Fleetwood Park, (5) Love Estates, and (6) Pine Bayou. After discovering these violations, the government initiated a criminal prosecution against Pruett, LLWC, and LWC Management. The seventeen-count indictment charged four broad categories of offenses, all in violation of 33 U.S.C. §§ 1311(a), 1342, and 1319(c)(2)(A): (1) failure to provide proper operation and maintenance of the facilities; (2) failure to maintain monitoring results as required by the permits; (3) discharge in excess of effluent limitations; and (4) unpermitted discharge. Several counts were dismissed on the government's motion.

No. 11-30572

Following a ten-day trial during which the government presented twenty witnesses, the jury was instructed that for each offense it could return a verdict of (1) guilty of a knowing violation (a felony), (2) guilty of a negligent violation (a misdemeanor), or (3) not guilty. The jury returned the following verdict: (1) a guilty verdict against all Appellants for a knowing violation of effluent limitations at Love Estates (Count 13), (2) a guilty verdict against Pruett and LLWC for a knowing violation of the record keeping requirement at all facilities (Counts 2, 5, 8, 11, 12, and 15), and (3) a guilty verdict against Pruett for a negligent violation of operation and maintenance requirements at Pine Bayou (Count 14). The Appellants were acquitted on all remaining counts.

Pruett was sentenced to twenty-one months incarceration on the felony convictions and twelve months on the misdemeanor conviction, to run concurrently, and a fine of $310,000. LLWC was fined $300,000 and LWC Management was fined $240,000, with the fines imposed on a joint and several basis against all Appellants. This appeal followed.

## II. DISCUSSION

Appellants challenge the sufficiency of the evidence, the jury instruction on negligence, certain evidentiary rulings, and the mid-trial dismissal of a juror. They also appeal the sentences imposed by the district court. We address each issue in turn.

A.    *Sufficiency of the Evidence*

    1.    *Standard of Review*

As Appellants properly moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, they preserved their sufficiency of the evidence claim for appellate review. We review Appellants' challenge de novo. *See United States v. Ollison*, 555 F.3d 152, 158 (5th Cir. 2009). In assessing a challenge to the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). "When there is a conflict over testimony, the court will defer to the fact finder's resolution with respect to the weight and credibility of the evidence. To be sufficient, the evidence need not exclude every reasonable hypothesis of innocence, so long as the totality of the evidence permits a conclusion of guilt beyond a reasonable doubt." *United States v. Hicks*, 389 F.3d 514, 533 (5th Cir. 2004) (citations omitted).

2.    *Sufficiency of Evidence to Support Felony Convictions*

Under the CWA, the "discharge of any pollutant by any person shall be unlawful," except when, *inter alia*, that discharge is in compliance with the permitting requirements of § 1342. *See* 33 U.S.C. § 1311(a). Section 1319 prescribes both civil and criminal penalties for violations of these requirements. Criminal penalties are divided into "[n]egligent violations" (misdemeanors) and "[k]nowing violations" (felonies). 33 U.S.C. § 1319(c)(1)(A),[1] (c)(2)(A).[2]

---

[1] Section 1319(c)(1)(A), applicable to negligent violations, provides:

Any person who–

(A) negligently violates section 1311 . . . of this title, or any permit condition or limitation implementing any of such sections in a permit issued under section 1342 of this title by the Administrator or by a State . . . .

shall be punished by a fine of not less than $2,500 nor more than $25,000 per day of violation, or by imprisonment for not more than 1 year, or by both. . . .

[2]  Section 1319(c)(2)(A), applicable to knowing violations, provides:

Any person who–

(A) knowingly violates section 1311 . . . of this title, or any permit condition or limitation implementing any of such sections in a permit issued under section 1342 of this title by the Administrator or by a State . . . .

No. 11-30572

Appellants appeal their felony convictions with respect to certain effluent and record keeping violations. We find that the government presented sufficient evidence to support the convictions.

> i.     *Effluent Violations*

Appellants appeal their felony convictions with respect to Count 13, which alleged that from May 2005 to August 2008, Appellants knowingly discharged pollutants at the Love Estates treatment facility in excess of effluent limitations set forth in their NPDES permit. On appeal, they concede that the government produced sufficient evidence to prove that the violations occurred, but argue that the government did not produce sufficient evidence of their intent. The government responds that it demonstrated the requisite intent through "the near constancy and extended duration of the Love Estates violations" over a four-year period.

In general, "[t]he intent necessary to support a conviction can be demonstrated by direct or circumstantial evidence that allows an inference of unlawful intent, and not every hypothesis of innocence need be excluded." *United States v. Aggarwal*, 17 F.3d 737, 740 (5th Cir. 1994). Prior acts may be introduced to prove intent. FED. R. EVID. 404(b); *see United States v. El–Mezain*, 664 F.3d 467, 549-50 (5th Cir. 2011). In *United States v. Greuling*, No. 95-50705, 1996 WL 460109 (5th Cir. Aug. 1, 1996), we found sufficient evidence to support a factory owner's conviction under 33 U.S.C. § 1319(c)(2)(A) for knowingly discharging pollutants into a city sewer system. There, the government had presented evidence of Greuling's substantial experience in the industry, his knowledge of inadequate factory conditions, the repeated citations and reports of excess discharges at the factory, and his failure to allocate money to repair the

---

shall be punished by a fine of not less than $5,000 nor more than $50,000 per day of violation, or by imprisonment for not more than 3 years, or by both. . . .

No. 11-30572

factory. *Id.* at *2-3. Similar evidence exists here. Pruett worked in the industry since 1986 and was familiar with his permit obligations. The government presented evidence demonstrating that the effluent violations at Love Estates were constant up to and including the period charged in the indictment (a period of approximately four years).[3] At some points, the discharges at Love Estates were double or triple the levels allowed by the permit. The government also introduced testimony from an inspector that Pruett had installed an unorthodox makeshift measure (an old rail car) at the Love Estates facility, even though Pruett knew that the rail car was not authorized for water treatment purposes.

In light of this evidence, which we must view in the light most favorable to the prosecution, we find that a rational trier of fact could have found beyond a reasonable doubt that Appellants knowingly violated the permit limitations at Love Estates. Therefore, there was sufficient evidence to support the Appellants' convictions on Count 13.

### ii. *Records Violations*

Pruett and LLWC also challenge the sufficiency of the evidence with respect to Counts 2, 5, 8, 11, 12, and 15, which alleged violations of record keeping requirements. We find sufficient evidence to support the convictions.

Under 33 U.S.C. § 1319(c)(2)(A), it is a felony to knowingly violate "any permit condition or limitation implementing" the CWA. Among other things, Pruett's NPDES permits required him to ensure that

> [inspectors] [h]ave access to and copy, at reasonable times, any records that the department or its authorized representative determines are necessary for the enforcement of this permit. For records maintained in either a central or private office that is open only during normal office hours and is closed at the time of

---

[3] In contrast, mere temporary noncompliance would be considered an "upset," and not evidence of a knowing violation. *See* 40 C.F.R. § 122.41(n)(1). A demonstration of an "upset" "constitutes an affirmative defense to an action brought for noncompliance" if certain conditions are met. *Id.* § 122.41(n)(2).

No. 11-30572

> inspection, the records shall be made available as soon as the office is open, but in no case later than the close of the next business day.

During EPA and LDEQ inspections at several of Appellants' facilities, inspectors demanded that Pruett produce certain operating records. Pruett claimed that he could not produce the records because he had sent them to his civil attorney in Baton Rouge in response to a subpoena. The jury convicted Pruett and LLWC on six counts of records violations, based upon inspections at his facilities in November 2007, December 2007, and August 2008.

On appeal, Pruett and LLWC argue that the inspectors had "access" to the records, as required by the permits, even though the records were in Baton Rouge and not at the inspected facilities. In the alternative, they maintain that any violation of the record keeping requirement was unintentional.

We conclude that there is sufficient evidence to support the record keeping convictions. Pruett did not provide "access" to the records merely by telling investigators that those records were located at his attorney's office in Baton Rouge. Although the permits contemplate that records might be maintained at an office that is closed at the time of inspection, the permits nevertheless require that the records "shall be made available as soon as the office is open, but in no case later than the close of the next business day." Consistent with this requirement, inspectors allowed Pruett twenty-four hours to produce the records, but Pruett never did so. Pruett therefore did not provide "access" to the records as required by his permits.[4]

---

[4] Pruett and LLWC also argue that the rule of lenity requires reversal of the records convictions, as the "access" requirement is ambiguous and should be interpreted in their favor. We decline to apply the rule of lenity. Under this rule of interpretation, "when [a] choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before [a court] choose[s] the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *Jones v. United States*, 529 U.S. 848, 858 (2000) (citation and internal quotation marks omitted). "To invoke the rule, we must conclude that there is a *grievous ambiguity or uncertainty* in the statute." *Muscarello v. United States*, 524 U.S. 125, 138-39 (1998) (emphasis added) (citations and internal quotation marks

7

No. 11-30572

We also find sufficient evidence of intent. In light of Pruett's experience, he knew or should have known that he was required to maintain records for inspectors. The permits themselves also put Pruett on notice that he had a duty to maintain records and produce them during inspections. The inspectors likewise stressed to Pruett the importance of providing documentation during their November 2007 inspections. Pruett nevertheless failed to provide the records when inspectors returned in December 2007 and August 2008. In August 2008, Pruett did not even provide a civil subpoena as an excuse for this failure. These repeated incidents constitute sufficient evidence for the jury to conclude that Pruett knew of his obligations, but intentionally failed to turn his records over to inspectors. Although Pruett attempted to provide an innocent explanation for his failures, the jury was free to disbelieve him and conclude that he intentionally failed to provide inspectors with access to his records.

In sum, we conclude that there was sufficient evidence to support Pruett's and LLWC's convictions on Counts 2, 5, 8, 11, 12, and 15.

*3.    Sufficiency of the Evidence to Support Misdemeanor Conviction*

Finally, Pruett challenges his conviction for negligent operation and maintenance of the Pine Bayou treatment facility (Count 14). We find sufficient evidence to support this conviction as well.

At trial, EPA inspector Patricia Willis testified about the normal operation of a treatment facility and the handling of sludge. She testified that when she visited Pine Bayou, there was no sludge in the "sludge drying bed," where it is usually located, and instead she found approximately four feet of sludge in the "chlorine contact chamber," which is used to treat wastewater with disinfectant prior to discharge, and normally contains no sludge. This sludge was ultimately discharged into the receiving stream near the Pine Bayou facility. Willis also

---

omitted). We find no "grievous ambiguity" in the "access" requirement sufficient to apply the rule of lenity.

testified that the discharge into the Pine Bayou creek originated from the facility's discharge pipe, and the creek received sludge from the facility itself. Pruett acknowledged that in "normal operation, the [chlorine contact chamber] would not be full of sludge," but contested Willis's estimate of the amount of sludge in the chamber and her explanation for the sludge discharge in the creek. Pruett's expert, Charles Duthill, testified that sludge discharge at a facility like Pine Bayou can be expected, and that the facility operated within permit limitations.

The jury ultimately credited Willis's testimony regarding the conditions at Pine Bayou, and discounted Pruett's and Duthill's testimony. The evidence demonstrated that Pruett was aware of the appropriate standard of care, but allowed the facility to operate in a manner inconsistent with that standard, thus resulting in the excess discharge. Although Pruett provided a different account of the incident, the jury was "free to choose among all reasonable constructions of the evidence." *United States v. Ibarra*, 286 F.3d 795, 797 (5th Cir. 2002) (citation and internal quotation marks omitted). Thus, the evidence was sufficient to support Pruett's conviction on Count 14.

B.     *Negligence Jury Instruction*

1.     *Standard of Review*

Where, as here, a jury instruction issue presents a question of statutory interpretation, we review the issue de novo. *See United States v. Ho*, 311 F.3d 589, 605 (5th Cir. 2002).

2.     *Analysis*

As noted above, 33 U.S.C. § 1319(c)(1)(A) imposes criminal penalties for "negligent violations" of permit conditions. Appellants requested that the district court give the jury a gross negligence definition based on § 2.02(2)(d) of the Model Penal Code, and proposed the following instruction:

A defendant acts negligently with respect to a violation of the CWA when he should be aware that there is a substantial and unjustifiable risk that the violation exists or will result from his conduct. The risk must be of such a nature and degree that the defendant's failure to perceive it, considering the nature and purpose of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a reasonable person would observe in the defendant's situation.

Over Appellants' objection, the court instead gave the following instruction:

Negligence is the failure to use reasonable care. Reasonable care is that amount of care that a reasonably prudent person would use in similar circumstances. Negligence may consist of doing something which a reasonably prudent person would not do, or it may consist of a failing to do something which a reasonably prudent person would do. A reasonably prudent person is not the exceptionally cautious or skillful individual, but a person of reasonable and ordinary carefulness.

Appellants argue that the court's ordinary negligence instruction was erroneous, as § 1319(c)(1)(A) requires proof of gross negligence. Whether § 1319(c)(1)(A) requires ordinary or gross negligence is a question of first impression in this circuit.

We begin, as we must, with the statutory text. *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980) ("[T]he starting point for interpreting a statute is the language of the statute itself."). Section 1319(c)(1)(A) refers explicitly to "negligent" violations of the CWA. Negligence is not an ambiguous term, and is understood to mean "[t]he failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation." BLACK'S LAW DICTIONARY 1061 (8th ed. 2004). It is well established that courts "applying criminal laws must generally follow the plain and unambiguous meaning of the statutory language," and "[o]nly the most extraordinary showing of contrary intentions in the legislative history will justify a departure from that language." *Salinas v. United States*, 522 U.S. 52,

57 (1997) (citation and internal quotation marks omitted); *see GTE Sylvania, Inc.*, 447 U.S. at 108. As we have found no such contrary intentions in the statute's legislative history, we are bound by § 1319(c)(1)(A)'s plain and unambiguous language. We must therefore conclude that § 1319(c)(1)(A) requires only proof of ordinary negligence. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) ("[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.") (citations and internal quotation marks omitted).[5]

This conclusion is consistent with our interpretation of other criminal statutes that require negligence. In *United States v. O'Keefe*, 426 F.3d 274 (5th Cir. 2005), we addressed the proper interpretation of "negligence" in 18 U.S.C. § 1115, which provides: "[e]very captain . . . by whose misconduct, negligence, or inattention to his duties on [a] vessel the life of any person is destroyed . . . shall be . . . imprisoned not more than ten years . . . ." *Id.* at 277. The district court rejected the defendant's argument that gross negligence was required under the statute, and this court affirmed. The *O'Keefe* court explained, "when the plain meaning of the statute is clear on its face, courts are required to give effect to the language of the statute according to its terms." *Id.* at 279. The court then evaluated § 1115, and found "nothing in the statute's terms suggesting that the words 'misconduct, negligence or inattention,' were ever meant to imply gross negligence or heat of passion . . . ." *Id.* This rationale is equally applicable to

---

[5] Where Congress has in fact intended to require gross negligence rather than negligence, it has said so explicitly, as it did in 33 U.S.C. § 1321(b)(7)(D). This section of the CWA provides for increased civil penalties "[i]n any case in which a violation of [33 U.S.C. § 1321(b)(3)] was the result of gross negligence or willful misconduct." 33 U.S.C. § 1321(b)(7)(D). In contrast, § 1319(c)(1)(A) refers only to "[n]egligent violations." Where "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983).

No. 11-30572

§ 1319(c)(1)(A), and bolsters our conclusion that this subsection imposes an ordinary negligence standard.

The Ninth and Tenth Circuits have likewise held that § 1319(c)(1)(A) requires only ordinary negligence. In *United States v. Hanousek*, 176 F.3d 1116 (9th Cir. 1999), the Ninth Circuit rejected a similar argument to the one Appellants advance here. The court relied upon the plain language of the statute and reasoned that Congress could have imposed a heightened standard if it so chose. *Id.* at 1120-21. The Tenth Circuit has reached a similar conclusion. *See United States v. Ortiz*, 427 F.3d 1278, 1283 (10th Cir. 2005) ("Under the statute's plain language, an individual violates the CWA by failing to exercise the degree of care that someone of ordinary prudence would have exercised in the same circumstance . . . ."). [6]

Appellants rely largely upon our holding in *United States v. Ahmad*, 101 F.3d 386 (5th Cir. 1996), that the CWA is not a "public welfare" statute, and thus requires criminal *mens rea. Id.* at 391. *Ahmad*, however, is not on point. There, the court had to decide whether the "knowingly" requirement of § 1319(c)(2)(A) applied to each element of the offense, or instead only to the "discharge" element. Noting that the CWA is not a public welfare statute, the court determined that the *mens rea* requirement applied to each non-jurisdictional element of the

---

[6] While Appellants acknowledge *Hanousek* and *Ortiz*, they rely upon an unpublished district court decision, *United States v. Atlantic States Cast Iron Pipe Co.*, No. 03-852 (MLC), 2007 WL 2282514 (D.N.J. Aug. 2, 2007), to support their gross negligence argument. Such reliance is misplaced. The *Atlantic States* court applied an ordinary negligence standard, consistent with *Hanousek*, but in dicta criticized *Hanousek*'s reliance on the CWA's reference to "gross negligence" in certain civil provisions as incompatible with the Supreme Court's decision in *Safeco Insurance Co. v. Burr*, 551 U.S. 47 (2007). *Id.* at *14 n.17. In *Burr*, the Supreme Court cautioned that "[t]he vocabulary of the criminal side of [a statute] is . . . beside the point in construing the civil side." 551 U.S. at 60. This concern does not, however, undermine *Hanousek*. While *Hanousek* looked to a civil provision of the CWA when considering whether Congress meant "gross negligence" instead of "negligence" in § 1391(c)(1)(A), it did so only to note the plain language differences in terms used, not to define the term. Moreover, *Hanousek* did not rely solely upon this distinction to support its interpretation of § 1391(c)(1)(A).

offense. *Id.* The "public welfare" determination was relevant in that case because a provision of the statute was silent on the *mens rea* requirement. *See Staples v. United States*, 511 U.S. 600, 604-06 (1994). Here, in contrast, no investigation into the public welfare issue is necessary because the statute explicitly requires negligence.[7]

In sum, we find that § 1319(c)(1)(A) requires only proof of ordinary negligence, and thus hold that the district court's jury instruction was proper.

C.    *Evidentiary Rulings*

1.    *Standard of Review*

A district court's evidentiary rulings are typically reviewed for abuse of discretion. *United States v. Sanders*, 343 F.3d 511, 517 (5th Cir. 2003). This standard of review is "heightened in a criminal case, however, which demands that evidence . . . be strictly relevant to the particular offense charged." *United States v. Hernandez–Guevara*, 162 F.3d 863, 869 (5th Cir. 1998) (citation and internal quotation marks omitted). Error is not grounds for reversal unless it "substantially prejudiced" the defendant's rights. *United States v. Lopez*, 979 F.2d 1024, 1034 (5th Cir. 1992); *see* FED R. CRIM. P. 52(a); FED. R. EVID. 103(a).

2.    *Rule 404(b) Evidence*

Appellants object to the large amount of uncharged conduct that the district court admitted into evidence pursuant to Federal Rule of Evidence 404(b).[8] Although they concede that the evidence was admissible to prove intent,

---

[7] Appellants also incorrectly contend that, absent gross negligence, "the standard for a civil violation of the CWA and a criminal violation based on negligence would be exactly the same." A civil violation of § 1319 does not in fact require proof of negligence. *See* 33 U.S.C. § 1319(b); *see also Kelly v. EPA*, 203 F.3d 519, 522 (7th Cir. 2000).

[8] Two types of extrinsic offense evidence are at issue here: (1) evidence of permit violations at wastewater treatment plants named in the indictment but occurring after the time period charged in the indictment, and (2) evidence of permit violations at other (unindicted) plants operated by Appellants. At trial, two witnesses testified exclusively as to uncharged conduct and five others testified as to both charged and uncharged conduct.

No. 11-30572

they contend that the evidence should have been excluded because it had little probative value in light of the significant amount of charged conduct already at issue. They further argue that even if the evidence had some probative value, that value was substantially outweighed by the danger of undue prejudice.

Under Federal Rule of Evidence 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b)(1), (2). This court analyzes Rule 404(b) admissions under the two-prong test first outlined in *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978). "First, the evidence of other crimes, wrongs, or acts must be relevant to an issue other than the defendant's character. . . . Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice." *United States v. Cockrell*, 587 F.3d 674, 678 (5th Cir. 2009) (citation and internal quotation marks omitted). "In weighing the probative value and unfair prejudice, this court must make a 'commonsense assessment of all the circumstances surrounding the extrinsic offense.' Probative value 'must be determined with regard to the extent to which the defendant's unlawful intent is established by other evidence, stipulation, or inference.'" *Id.* at 678-79 (quoting *Beechum*, 582 F.2d at 914). Other factors to be considered include "'the overall similarity of the extrinsic and charged offenses, and the amount of time that separates the extrinsic and charged offenses' as well as any limiting instructions." *Id.* at 679 (quoting *United States v. Richards*, 204 F.3d 177, 199-201 (5th Cir. 2000)).

The first part of the *Beechum* test is not disputed; Appellants concede that the evidence was relevant to intent or absence of mistake. We find that the second part of *Beechum* is also satisfied, as the probative value of the evidence

14

No. 11-30572

is not substantially outweighed by its undue prejudice. Contrary to Appellants' contention, the probative value of the uncharged acts evidence was not "minimal." Intent was a central matter in dispute at trial, as Appellants had asserted that the various violations were isolated and accidental incidents. The evidence of other violations refuted this defense.

In arguing that the uncharged conduct overwhelmed the charged conduct, Appellants attempt to analogize their case to *United States v. Fortenberry*, 860 F.2d 628 (5th Cir. 1988). We see no basis for such an analogy. In that case, the court found that evidence of uncharged conduct so dominated Fortenberry's trial that the prejudice it created "substantially outweighed" its probative value. Fortenberry was charged with placing a small explosive device in an unoccupied car, which caused minimal damage. At trial, the government introduced extrinsic evidence involving three attacks with crossbow arrows, three incidents of arson, and an act of vandalism with a rifle, but failed to prove that Fortenberry was the perpetrator of these offenses. *Id.* at 632-33. These external offenses were "highly prejudicial," were "violent crimes," were of "a magnitude far greater than the charged offenses," and "occupied more of the jury's time than the evidence of the charged offenses." *Id.* at 632. Therefore, the court concluded that, "this tail wagged the dog," and ordered a new trial. *Id.* at 632, 636. This case is different. There is no dispute that Appellants were the perpetrators of the offenses, and the uncharged offenses were the same type of environmental crimes as the charged offenses. Although the evidence of uncharged conduct was substantial, it did not overwhelm the charged conduct.

Finally, we see no indication that the extrinsic evidence played more to the jury's emotions than it did to the issue of intent. We have found this to be a legitimate concern where "[t]he extrinsic offense . . . is . . . of a heinous nature; [such that it] would . . . incite the jury to irrational decision by its force on human emotion." *Beechum*, 582 F.2d at 917. The testimony at issue here, mainly

15

relating to the discharge of raw sewage and Pruett's makeshift efforts to repair ongoing problems, is not particularly emotionally charged or incendiary. To the extent the evidence may have had an improper effect, the district court properly "minimized the danger of unfair prejudice by instructing the jury regarding the limited purposes for which it could consider the evidence." *United States v. Charles*, 366 F. App'x 532, 539 (5th Cir. 2010); *see also United States v. Booker*, 334 F.3d 406, 412 (5th Cir. 2003).

In sum, we conclude that the district court did not err in admitting the Rule 404(b) evidence at issue here.

### 3.    *Negative Character Evidence*

At trial, the government called Richard Crockett as a negative character witness to provide evidence regarding Pruett's character for truthfulness and honesty, pursuant to Federal Rule of Evidence 608(a). Crockett had worked for Pruett for about three months. Pruett argued that the testimony was inadmissible under Federal Rule of Evidence 403 because the probative value of Crockett's opinion was outweighed by the risk of undue prejudice. Although the district court was initially concerned that Crockett was a disgruntled former employee, the court ultimately found no reason to exclude the testimony. On the stand, Crockett was asked his opinion of Pruett's truthfulness, and answered only, "there is none." On appeal, Pruett maintains that the evidence should have been excluded under Rule 403 in light of Crockett's past employment relationship with Pruett. Pruett contends that this testimony was unfairly prejudicial because his credibility was critical in the case, and the testimony cast him as dishonest.

Under Rule 403, a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." FED. R. EVID. 403. The standard of review for an alleged Rule 403 violation is "'especially high' and requires 'a clear abuse of discretion' for reversal." *United States v.*

16

No. 11-30572

*Setser*, 568 F.3d 482, 495 (5th Cir. 2009) (citation omitted); *see also El–Mezain*, 664 F.3d at 511 ("Given the significant deference this court shows to the district court in Rule 403 matters, the district court's rulings will not be disturbed.").

We find that the district court did not abuse its discretion in admitting Crockett's testimony. Crockett worked with Pruett for three months and could therefore offer a valid opinion as to Pruett's truthfulness. If Pruett was concerned about Crockett's credibility and motivations, he could have inquired into these issues on cross-examination. Pruett never did so.

### 4.    *Impeachment of Witness*

At trial, the government called Columbus L. Smith to testify regarding Appellants' repeated failures to rectify overflows of raw sewage from a ditch at the Donovan Woods and Daywood Subdivision. In response, Appellants sought to impeach Smith's testimony with evidence that he was convicted in 2004 of a larceny in violation of 18 U.S.C. § 641. The district court ruled that Appellants could not question Smith about this conviction because larceny is not a "crime of dishonesty" under Federal Rule of Evidence 609(a)(2). Appellants now contend that they should have been permitted to cross examine Smith on this subject. We conclude that the district court properly precluded such cross examination.

Rule 609(a)(2), which applies when a party seeks to "attack[ ] a witness's character for truthfulness by evidence of a criminal conviction," provides that "for any crime regardless of the punishment, the evidence must be admitted if the court can readily determine that establishing the elements of the crime required proving—or the witness's admitting—a dishonest act or false statement." FED. R. EVID. 609(a)(2). In *Howard v. Gonzales*, 658 F.2d 352 (5th Cir. 1981), we held that the crime of theft was not a crime of dishonesty and was not admissible under Rule 609(a)(2) to impeach a witness's credibility. *Id.* at 358-59. Appellants recognize *Howard*, but contend that we are no longer bound by

17

it in light of subsequent amendments to Rule 609, which can now be read to include larceny as a crime of dishonesty.

Since *Howard*, Rule 609 was substantively amended in 1990 and 2006.[9] Relevant here, the advisory committee notes accompanying the 2006 amendments explain that "dishonesty and false statement," means "crimes such as perjury, subornation of perjury, false statement, criminal fraud, embezzlement, or false pretense, or any other offense in the nature of *crimen falsi*, the commission of which involves some element of deceit, untruthfulness, or falsification bearing on the [witness's] propensity to testify truthfully." FED. R. EVID. 609, advisory committee's note (internal quotation marks omitted). The notes direct a court to consider "the statutory elements of the crime" to determine whether it is "one of dishonesty or false statement." *Id.* Where the deceitful nature of the crime is not apparent from the statute and the face of the judgment, "a proponent may offer information such as an indictment, a statement of admitted facts, or jury instructions to show that the factfinder had to find, or the defendant had to admit, an act of dishonesty or false statement in order for the witness to have been convicted." *Id.*

The statute under which Smith was convicted, 18 U.S.C. § 641, provides:

> Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof . . . . [shall be punished.]

The Fifth Circuit criminal pattern jury instructions state the elements of theft under this section as follows: (1) the property at issue "belonged to the United States government and had a value in excess of $1,000 at the time alleged;" (2)

---

[9] The 1990 amendments made only two changes to Rule 609, neither of which we find to be relevant here. *See* FED. R. EVID. 609, advisory committee's note.

the defendant stole the property for his own use or use of another; and (3) the "defendant did so knowing the property was not his, and with intent to deprive the owner of the use . . . of the [property]." 5th Cir. Criminal Pattern Jury Instructions § 2.33. "Steal" or "convert" is defined as "the wrongful taking of money or property belonging to another with intent to deprive the owner of its use or benefit either temporarily or permanently." *Id.* In light of the statutory text and jury instructions, the crime for which Smith was convicted does not have "a dishonest act or false statement" as an element. Nor do Appellants argue that the manner in which Smith carried out his offense involved dishonesty or a false statement. We therefore conclude that the amendments to Rule 609 do not warrant a departure from this court's precedent that the crime of larceny is not admissible under Rule 609(a)(2). *See, e.g.*, *United States v. Entrekin*, 624 F.2d 597, 598-99 (5th Cir. 1980) (shoplifting); *Howard*, 658 F.2d at 358-59.

The district court thus properly ruled that Smith's prior conviction was not admissible under Rule 609(a)(2).

### D.    *Replacement of Juror*

On the fifth day of the trial, Juror No. 8 informed the court that his car had broken down and he had no alternative means of transportation to make the fifty mile trip from his residence to the courthouse. The juror's transportation problems were confirmed in a conference call with the court and counsel. Although the court initially suggested that a U.S. marshal could drive the juror to and from the courthouse, defense counsel objected because such a transit method could appear "heavy-handed." The court then replaced the juror with an alternate. Defense counsel objected to this as well, arguing that the trial was well underway, and alternative transportation could have been arranged. On appeal, Appellants contend that the juror was not "unable to perform" his duties as provided by Federal Rule of Criminal Procedure 24(c), and the district court therefore abused its discretion in dismissing the juror.

No. 11-30572

Pursuant to Rule 24(c)(1), a district court may "replace any jurors who are unable to perform or who are disqualified from performing their duties." FED. R. CRIM. P. 24(c)(1). "A district court's decision to remove a juror is discretionary whenever the judge becomes convinced that the juror's abilities to perform his duties become[ ] impaired." *United States v. Virgen–Moreno*, 265 F.3d 276, 288 (5th Cir. 2001) (citation and internal quotation marks omitted). Further, "[u]nless the court's removal of the juror has prejudiced the defendant, [this court] will not disturb the [district] court's decision." *Id.* Such prejudice is found "if the juror was discharged without factual support or for a legally irrelevant reason." *Id.* (citation and internal quotation marks omitted).

In this case, the juror's transportation problem was confirmed in a conference call, and defense counsel objected to the court's proposed resolution. Without a viable means of transportation to the courthouse, the juror was "unable to perform" his duties. FED. R. CRIM. P. 24(c). The district court was therefore within its discretion to excuse the juror and replace him with an alternate.

*E.    Sentencing Enhancement*

At sentencing, the district court included in Pruett's guideline range a two-level enhancement pursuant to U.S.S.G. § 3B1.3, finding that Pruett abused a position of private trust in a manner that specifically facilitated the commission or concealment of the offense. On appeal, Pruett argues that the district court erred in applying this enhancement. He concedes that he held a position of private trust as president and chief executive officer of LLWC and LWC Management, but argues that he did not abuse this position in a manner that significantly facilitated the commission or concealment of the offense.[10]

---

[10] The district court based its determination upon Pruett's role as the "sole officer and shareholder of LLWC and LWC [Management]," as well as his status as a permit holder. "'Public or private trust' refers to a position of public or private trust characterized by

No. 11-30572

A "district court's application of section 3B1.3 is a sophisticated factual determination that [an appellate court] review[s] for clear error." *United States v. Miller*, 607 F.3d 144, 147-48 (5th Cir. 2010). Under U.S.S.G. § 3B1.3, a two-level increase in offense level is permitted if "[1] the defendant abused a position of public or private trust, or used a special skill, [2] in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3; *see United States v. Ollison*, 555 F.3d 152, 165 (5th Cir. 2009). We define significant facilitation by considering "whether the defendant occupied a superior position, relative to all people in a position to commit the offense, as a result of her job." *United States v. Kay*, 513 F.3d 432, 459 (5th Cir. 2007) (citation and internal quotation marks omitted). The application notes accompanying § 3B1.3 explain:

> For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination.

U.S.S.G. § 3B1.3, cmt. 1.

We have found the second element of § 3B1.3 to be satisfied where the defendant's position made the criminal conduct easier to perform or where it facilitated his crime. *See, e.g.*, *Miller*, 607 F.3d at 150 ("Miller offers no argument that her position [as the owner of a licensed durable medical equipment

professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." U.S.S.G. § 3B1.3, cmt. 1. We have found that a president and chief executive officer of a company occupies a position of trust for purposes of § 3B1.3. *See United States v. Dahlstrom*, 180 F.3d 677, 685 (5th Cir. 1999). Because Pruett does not challenge the district court's findings on this issue, we need not consider whether Pruett's status as a NPDES permit holder also satisfies the position of trust requirement.

21

provider] did not facilitate the commission of the offense; nor could she, since it was her position as the owner . . . that enabled her to defraud the government insurance programs with such ease."); *United States v. Reeves*, 255 F.3d 208, 212-13 (5th Cir. 2001) ("Only after gaining his clients' trust by posing as an estate planner did [Reeves] advise them to invest in his codefendant's company. Had he not occupied the position of trust, the clients presumably would not have followed his investment advice. Moreover, there is substantial evidence that Reeves's position as estate planner gave him unique access to clients' financial information, facilitating his fraudulent schemes.").

Other circuits have affirmed the application of the § 3B1.3 enhancement in § 1319 cases. In *United States v. Snook*, 366 F.3d 439 (7th Cir. 2004), the defendant was an environmental manager of Clark Refining & Marketing, Inc., a petroleum refinery, and in this position was "given discretion to devise Clark's wastewater treatment and testing systems, as well as to decide when to conduct such testing." *Id.* at 445-46. Although the local water district "periodically conduct[ed] its own testing, it was for the most part dependent on the data that Clark reported," and for "over three years Clark's wastewater had numerous violations that went undetected because Snook, in his unique position as Environmental Manager, did not report them." *Id.* at 446. The Seventh Circuit concluded, "[g]iven the responsibility and discretion given to Snook in his position as Environmental Manager in complying with the District's regulations, and his abuse of that position, the district court did not err in applying the sentencing increase." *Id.*; *see also United States v. Kuhn*, 345 F.3d 431, 437 (6th Cir. 2003) ("[I]t is clear that the [§ 3B1.3] enhancement was properly applied. Kuhn was a government employee, charged with the safe and efficient operation of a wastewater treatment operation. He was convicted of knowingly causing sewage sludge to be discharged into a navigable waterway and falsifying reports. . . . Moreover, his high-level position with respect to his public function of

wastewater treatment, contributed in some significant way to facilitating the commission of his offense.") (citation and internal quotation marks omitted).

In this case, the district court did not clearly err in concluding that Pruett used his position as the president and chief executive officer of LLWC and LWC Management to facilitate the commission of the offenses. The district court correctly reasoned that Pruett was the sole "boss" of LLWC and LWC Management, and controlled "all aspects of the businesses." Indeed, in his position, Pruett had discretion to decide what efforts should be undertaken to comply with his permit obligations. Pruett was also responsible for overseeing his facilities' treatment and testing systems, as well as for maintaining accurate records. Although the LDEQ and EPA conducted their own inspections, they depended in large part upon Pruett to monitor his own operations. Pruett's position thus facilitated his offenses. We therefore conclude that the district court did not clearly err in applying the § 3B1.3 enhancement.

## F. Fines

The district court imposed the following fines on each Appellant, jointly and severally: (1) $310,000 for Pruett, (2) $300,000 for LLWC, and (3) $240,000 for LWC Management. Appellants object to these fines on various grounds.

We "review sentencing decisions for unreasonableness." *United States v. Booker*, 543 U.S. 220, 264 (2005). "Though flexible, the reasonableness standard is not unbounded. Both a district court's post–*Booker* sentencing discretion and the reasonableness inquiry on appeal must be guided by the sentencing considerations set forth in 18 U.S.C. § 3553(a)," *United States v. Smith*, 440 F.3d 704, 706 (5th Cir. 2006), as well as the factors under 18 U.S.C. § 3572(a).

Under § 1319(c)(2), a court may impose a fine of "not less than $5,000 nor more than $50,000 per day of violation." 33 U.S.C. § 1319(c)(2). The district court imposed a fine of $10,000 per knowing records violation, for a total of $60,000. Pruett and LLWC argue that they should not have been fined six different times

for the same records violation, and that the district court should have imposed the statutory minimum per violation ($5,000) rather than $10,000. We conclude, however, that the district court's fine was reasonable. Section 1319(c)(2) authorizes a fine to be imposed "per day of violation," 33 U.S.C. § 1319(c)(2), and the district court therefore did not err in imposing six separate fines corresponding to knowing violations at the six separate facilities. Further, the record demonstrates that the court fully considered the statutory factors provided by 18 U.S.C. §§ 3553(a)(2) and 3572, and the fines are not unreasonable in light of those factors. The choice between a $5,000 and $10,000 fine was well within the district court's discretion.

Appellants also argue that the district court should have imposed the statutory minimum with respect to four days of knowing effluent limitation violations at the Love Estates plant, rather than a $15,000 per day fine, because the violations for those days would not have constituted violations under a new permit issued after the incidents charged in the indictment. We disagree. The district court considered Appellants' arguments regarding the new permit, and in response imposed a $15,000 fine for those dates instead of the $20,000 fine imposed for the other discharge dates. It was reasonable for the district court to decline Appellants' request for an even lower fine. Appellants do not contend, nor do we find, that the fines were unreasonable under the statutory factors. *See* 18 U.S.C. §§ 3553(a)(2), 3572.

In sum, we hold that the fines imposed upon Appellants were reasonable.

### III. CONCLUSION

For the reasons stated above, Appellants' convictions and sentences are AFFIRMED.

No. 11-30572

EDWARD C. PRADO, Circuit Judge, concurring:

I write separately to discuss the court's review of the district court's application of the two-level abuse-of-trust enhancement to Pruett's sentence under U.S.S.G. § 3B1.3.

Standard of review is frequently viewed as a cursory statement that precedes a court's analysis of the relevant issues on appeal. But the maxim that "standard of review decides cases" is crucial to understanding the actual work of an appellate court.[1] As Childress and Davis have written in their seminal treatise on the matter, "Although standards of review often are baldly stated without explicit reference to the relevant degree of deference, deference is always the underlying notion." Stephen Alan Childress & Martha S. Davis, 2 Federal Standards of Review § 7.02 (4th ed. 2010). Viewed from the opposite side of the coin, "a review standard describes the positive authority the appellate court wields in its review function." *Id.* § 1.01. Given its crucial importance in the scheme of how an appellate court works, this court's inattention to the proper standard for review of sentencing enhancements is troubling. Such inattention is rendered even more troubling upon recognizing that a central goal of our federal sentencing regime is to provide for uniformity. *See Koon v. United States*, 518 U.S. 81, 113 (1996); *United States v. Goncalves*, 613 F.3d 601, 608 (5th Cir. 2010).

As it pertains to the enhancement challenged by Pruett in this case, *United States v. Dial* acknowledged the intra-circuit split as to the appropriate standard of review for § 3B1.3 enhancements. 542 F.3d 1059, 1060 (5th Cir. 2008).

> We review for clear error the district court's application of § 3B1.3
> to the facts, including its factual determination that Dial held a

---

[1] Oddly enough in this case, the relevant standard of review is of little consequence because under any standard, Pruett's § 3B1.3 enhancement would be upheld.

position of trust.  *See United States v. Smith*, 203 F.3d 884, 893 (5th Cir. 2000); *United States v. Ehrlich*, 902 F.2d 327, 330 (5th Cir. 1990).  This court recently applied *de novo* review to whether the defendant held a position of trust.  *See United States v. Kay*, 513 F.3d 432, 460 (5th Cir. 2007)[, *cert. denied*, 129 S. Ct. 42 (2008)].  The panel in *Kay*, 513 F.3d at 460 & n. 125, relied on *United States v. Sudeen*, 434 F.3d 384, 391 n. 19 (5th Cir. 2005), which based its statement on *United States v. Hussey*, 254 F.3d 428, 431 (2d Cir. 2001), after observing that the standard of review would not affect its decision.

*De novo* review appears foreclosed, however, by this circuit's earlier ruling that a "district court's application of § 3B1.3 is a sophisticated factual determination that will be affirmed unless clearly erroneous."  [*Ehrlich*, 902 F.2d at 330.]  Despite whatever persuasiveness *Kay* and *Sudeen* may have, our rule of orderliness directs that "'one panel of this court cannot overrule the decision of another panel.'"  [*Lowrey v. Tex. A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997).]

*Id.* (footnotes omitted).  Therefore, the standard of review used by the court in this case—clear error—is the correct one,[2] *see supra* Per Curiam Op. at 21, based on earliest case controls, *see Matter of Howard*, 972 F.2d 639, 641 (5th Cir. 1992).

It is not just in the context of § 3B1.3 enhancements that we have been inconsistent in our standard of review for Guidelines enhancements.  I have previously written about the intra-circuit split as to "whether the determination that [U.S.S.G.] § 3C1.1's [obstruction of justice] requirements are met is . . . a question of fact" or a question of law and what the corresponding standard of review is—a question that has also produced an inter-circuit split.  *See United States v. Claiborne*, __ F.3d __, No. 10-51189, 2012 WL 1021274, at \*5 n.1 (5th

---

[2] It is, however, worth noting that *Dial* has not cleared up all confusion in this circuit about the proper standard of review for § 3B1.3 enhancements, as at least one panel post-*Dial* has applied de novo review.  *See, e.g.*, *United States v. Carr*, 303 F. App'x 166, 170 (5th Cir. 2008).

No. 11-30572

Cir. Mar. 28, 2011) (Prado, J., concurring).  Broadly framed, the issue is whether adjustments under Section 3 of the Guidelines are questions of law reviewed de novo or questions of fact reviewed for clear error.

The First Circuit in *United States v. Sicher*, 576 F.3d 64 (1st Cir. 2009), nicely summarizes the uncertainty (and split amongst the circuits) in this area of sentencing law, with specific reference to § 3B1.3 enhancements.

> While we have used the language of "de novo" review to apply to a trial judge's legal conclusion from the facts, we think this is more like a mixed question of law and fact, with a sliding scale of review depending on whether the trial judge's conclusion is more law-oriented or more fact-driven.  Recently the D.C. Circuit, recognizing that it had used different standards of review, stated that "insofar as the district court applied the 'abuse of trust' Guideline to the facts of [the defendant's] case, due deference is the appropriate standard of review."  *United States v. Tann*, 532 F.3d 868, 875 n.* (D.C. Cir. 2008).
>
> Several circuits state that they review the application of the Guidelines de novo and the district court's factual findings for clear error. *United States v. Spear*, 491 F.3d 1150, 1153 (10th Cir. 2007); *United States v. Andrews*, 484 F.3d 476, 478 (7th Cir. 2007); *United States v. Brave Thunder*, 445 F.3d 1062[, 1065] (8th Cir. 2006); *United States v. Ebersole*, 411 F.3d 517, 535–36 (4th Cir. 2005); *United States v. Britt*, 388 F.3d 1369, 1371 (11th Cir. 2004) (per curiam), *vacated on other grounds*, 546 U.S. 930 (2005); *see also United States v. Brogan*, 238 F.3d 780, 783 (6th Cir. 2001) (reviewing de novo decision of a district court to apply § 3B1.3).
>
> Other circuits have framed the standard of review somewhat differently. *See United States v. Dullum*, 560 F.3d 133, 140 (3d Cir. 2009) (district court's determination that defendant occupied a position of trust reviewed de novo; the court's determination that defendant abused that position in a manner that significantly facilitated the offense is a question of fact reviewed for clear error); *United States v. Hirsch*, 239 F.3d 221, 227 (2d Cir. 2001) (same); *see also United States v. Ollison*, 555 F.3d 152, 164 (5th Cir. 2009) ("The application of . . . § 3B1.3 is a sophisticated factual determination reviewed under the clearly erroneous standard." (quoting *United*

27

*States v. Fisher*, 7 F.3d 69, 70–71 (5th Cir. 1993))); *cf. United States v. Thornton*, 511 F.3d 1221, 1227 n. 4 (9th Cir. 2008) ("Before *Booker*, we reviewed the application of the abuse of trust enhancement—a mixed question of law and fact—de novo . . . Although the same standard of review may well apply after *Booker*, we need not decide the issue." (citation omitted)).

*Id.* at 70 n.6.

Keeping the principles of deference that undergird standard of review in mind, the district court's determination that a defendant abused a position of trust or obstructed justice seems to be similar to a jury's determination of a defendant's guilt. The jury is given a set of legal principles to which they must apply the facts as they find them. This is the same sort of inquiry that the district court conducts: finding facts and then applying the law (in sentencing, the Guidelines) to those facts. *See United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008) ("[A] district court's interpretation or application of the Sentencing Guidelines is reviewed de novo, and its factual findings are reviewed for clear error." (internal quotation marks and ellipsis omitted)).

The hybrid nature of this process is reflected in the standard of review for convictions by a jury. In reviewing the sufficiency of the evidence supporting a jury's verdict, we apply a deferential variant of de novo review. Our review is de novo, but we view all of the evidence, resolve all credibility determinations, and make all reasonable inferences in favor of the jury verdict. *United States v. Winkler*, 639 F.3d 692, 696 (5th Cir. 2011). The deference is accorded because of the jury's fundamental role in our criminal justice system. *See Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000).

Similar to the jury, the sentencing judge holds a special position in our criminal justice system. *See Booker v. United States*, 543 U.S. 220, 249–55, 265 (2005) (discussing the need for individualized assessment by judges before determining that the Guidelines could not operate as mandatory); *see also Koon*,

No. 11-30572

518 U.S. at 113 ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."). As a former district judge (for nineteen years), I know well that such an individualized assessment is crucial to ensure that justice is a central component of federal sentencing. However, insulating such determinations with a standard such as clear error undercuts the goal of uniformity because often the determination that clear error applies will functionally foreclose review by this court. Therefore, consistent with *Sicher*'s description of these questions as "mixed question[s] of law and fact," 576 F.3d at 70 n.6, I think we ought to revisit the standard of review we apply to enhancements, like that under § 3B1.3.

In doing so, the D.C. Circuit has crafted the best articulation of what the standard of review should be: due deference. In standard of review,

> Congress crafted a trichotomy: purely legal questions are reviewed *de novo*; factual findings are to be affirmed unless "clearly erroneous"; and we are to give "due deference" to the district court's application of the guidelines to facts. "Due deference" presumably is meant to fall somewhere between *de novo* and "clearly erroneous," a standard of review that reflects an apparent congressional desire to compromise between the need for uniformity in sentencing and the recognition that the district courts should be afforded some flexibility in applying the guidelines to the facts before them.

*United States v. Kim*, 23 F.3d 513, 517 (D.C. Cir. 1994); *see also Gall v. United States*, 552 U.S. 38, 51 (2007) (describing the standard of review for sentences outside the advisory Guidelines ranges as being for "due deference").

We, as a court, need to bring consistency and logic to our review of sentencing enhancements. The scattershot approach that we have taken in this

No. 11-30572

realm threatens uniformity and does not adequately grapple with the difficult issues of deference present in this area of the law.