# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## KA 12-540


**STATE OF LOUISIANA**

**VERSUS**

**JOSEPH JONES, ET AL**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTEENTH JUDICIAL DISTRICT COURT
PARISH OF EVANGELINE, NO. 84083FA
HONORABLE THOMAS F. FUSELIER, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## BILLY HOWARD EZELL
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Oswald A. Decuir, Billy Howard Ezell, and Phyllis M. Keaty, Judges.


**JOSEPH JONES: REVERSED IN PART; AFFIRMED IN PART AND REMANDED.**


**PLAISANCE DEVELOPMENT CORPORATION: CONVICTIONS AFFIRMED; SENTENCES SET ASIDE AND REMANDED.**

Michael David Skinner
Skinner Law Firm
P. O. Box 53146
Lafayette, LA 70505
(337) 354-3030
COUNSEL FOR DEFENDANTS/APPELLANTS:
  Joseph Jones
  Plaisance Development Corp.

**Michael James Daniels**
**P. O. Box 4301**
**Baton Rouge, LA 70821**
**(225) 219-0301**
**COUNSEL FOR APPELLEE:**
     **Louisiana Department of Environmental Quality**

**Trent Brignac**
**District Attorney, Thirteenth Judicial District Court**
**P. O. Box 780**
**Ville Platte, LA 70586**
**(337) 363-3438**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**Timmy James Fontenot**
**P. O. Box 68**
**Mamou, LA 70554**
**(337) 468-4052**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**EZELL, Judge.**

The Defendants, Joseph Jones and Plaisance Development Corporation (PDC), were charged in a bill of information filed on June 24, 2010, with fifteen counts of violating the Louisiana Pollutant Discharge Elimination System (LPDES), violations of La.R.S. 30:2076.2(B).[1]  On the same date, Jones and PDC entered pleas of not guilty.

Jury selection commenced on August 29, 2011, and the jury found Jones and PDC guilty on all charges on September 1, 2011.  On October 19, 2011, Jones was sentenced as follows:  1) counts 1, 4, and 14 - knowingly exceeding the effluent limitations - two years at hard labor on each count with all but nine months of each sentence suspended, five years active supervised probation upon release from incarceration, a fine of $20,000.00 on each count, and court costs of $500.00 on each count; all sentences, fines, costs, and probationary periods to run concurrently; 2) counts 2, 5, 7, 10, and 13 - knowingly not submitting a Discharge Monitoring Report (DMR) quarterly – two years at hard labor on each count with all but nine months of each sentence suspended, five years active supervised probation upon release from incarceration, a fine of $20,000.00 on each count, and court costs of $500.00 on each count; all sentences, fines, costs, and probationary periods to run concurrently; 3)

---

[1]"Louisiana Pollutant Discharge Elimination System (LPDES)" means those portions of the Louisiana Environmental Quality Act and the Louisiana Water Control Law and all regulations promulgated under their authority which are deemed equivalent to the National Pollutant Discharge Elimination System (NPDES) under the Federal Water Pollution Control Act, otherwise known as the Clean Water Act, and for which Louisiana is the delegated authority.  The LPDES specifically includes but is not limited to authority to issue all permits provided for under Sections 402 and 405 of the Federal Water Pollution Control Act, as well as the general permits program, the storm water discharge program, the pretreatment program, and the sewage sludge program.

La.R.S. 30:2073(1).

counts 6, 9, and 12 - knowingly not properly operating and maintaining facilities and treatment systems – two years at hard labor on each count with all but nine months of each sentence suspended, five years active supervised probation upon release from incarceration, a fine of $20,000.00 on each count, and court costs of $500.00 on each count; all sentences, fines, costs, and probationary periods to run concurrently; 4) counts 3, 8, 11, and 15 - knowingly discharging any substance into the waters of the state without an appropriate permit, variance, or license – two years at hard labor on each count with all but nine months of each sentence suspended, five years active supervised probation upon release from incarceration, a fine of $20,000.00 on each count, and court costs of $500.00 on each count; all sentences, fines, costs, and probationary periods to run concurrently. The sentences, fines, and costs with regard to each of the four types of violations were to run consecutively with each other and all probationary periods were to run concurrently.

PDC was sentenced to serve two years at hard labor on each of the fifteen counts, which were suspended, and it was placed on five years active supervised probation on each count. PDC was also ordered to pay a fine of $150,000.00 on each count and court costs of $5,000.00. All sentences, fines, costs, and probationary periods were to run concurrently.

A motion to reconsider sentence was filed on November 17, 2011, and was denied on December 7, 2011. A motion for appeal was filed on January 5, 2012, and was subsequently granted.

Jones is now before this court asserting the following assignments of error: 1) his sentences are excessive; 2) the evidence was not sufficient to support his convictions; 3) the trial court failed to instruct the jury on the definition of responsible

2

corporate officer; 4) the evidence was not sufficient to prove that he discharged into state waters; and 5) the trial court erred in not granting him a continuance.

PDC is now before this court asserting the following assignments of error: 1) its sentences are erroneous and excessive; 2) the evidence was not sufficient to prove it discharged into state waters; and 3) the evidence was not sufficient to prove it had a corporate existence.

## FACTS

By letter dated July 6, 2004, the Office of Environmental Services was informed of a credit sale by Evangeline Sewerage Company of several sewage systems to PDC, a nonprofit corporation. This sale included treatment facilities at East Side, Bye the Way, North Mamou, Kennedy, Poor Boy, and Theophile Subdivisions. The credit sale contained the following language:

> A. Sewerage collection and treatment facilities, including all of the sewer lines, pumps, customer list, contracts for sewer services, sewer deposits, servitude for the use, maintenance and repair of the sewer lines, all situated within the following identified subdivisions located in Evangeline and St. Landry Parishes, Louisiana:
>
> . . . .
>
> B. The use of the oxidation ponds of the sewerage systems, referenced to in Item A above, until the oxidation ponds become unusable or unnecessary.

The credit sale indicated the purchaser accepted the sewage systems "AS IS." Jones executed the credit sale on behalf of PDC on July 1, 2004.

Evangeline Sewerage and PDC also entered into an operating agreement on July 1, 2004, wherein Evangeline Sewerage continued to operate the sewer systems. The agreement was signed by Jones and indicated that PDC "had say so in the day to day operations" of the sewer systems and Evangeline Sewerage took instructions from PDC. The operating agreement further stated:

A. The Operator agrees to provide services, and to assist and train Owner's personnel in the operation, maintenance, and repair for the benefit of the Owner [of] the following:

> All sewerage systems and equipment, including all sewer lines, sewer pumps, customer lists and contracts for providing sewer services, sewer deposits, together with the use of the oxidation pond and all servitudes for maintenance of said sewer system, located in the subdivisions listed . . . .

The agreement stated it was for a term of one year, but that the operator would continue to invoice customers and collect monies to owner for an additional six months. Thus, the operating agreement terminated around January 2006.

Tom Killeen, the LPDES permit manager, and Ryan Brignac, a criminal investigator and division supervisor for the Louisiana Department of Environmental Quality (LDEQ), testified that a permit was required for the discharge of sanitary wastewater into the waters of the State. Additionally, permits were needed so that water quality of streams throughout the State that receive point source discharges could be regulated. Killeen testified that permits are given, and it was incumbent upon the permittee to conduct the sampling, reporting, operation, and maintenance required by the permit.

LDEQ issued permits to PDC for the East Side, Bye the Way, North Mamou, Kennedy, Poor Boy, and Theophile Subdivisions. The fifteen offenses for which Jones and PDC were convicted arise from violations of those permits.

## SUFFICIENCY OF THE EVIDENCE

In the second assignment of error, Jones contends the evidence was not sufficient to prove that he either did the things alleged in the bill of information or was a responsible corporate officer of PDC as required in order to convict him of the offenses charged. In the fourth assignment of error, Jones and PDC contend the evidence was not sufficient to prove they discharged into the waters of the State as

4

charged in counts three and fifteen. These assignments of error will be addressed first in the event Jones and PDC are entitled to acquittals. *State v. Hearold*, 603 So.2d 731 (La.1992).

> When an appellate court reviews a sufficiency of the evidence claim, the standard applied is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Captville*, 448 So.2d 676, 678 (La.1984). This standard has been codified by our legislature in Louisiana Code of Criminal Procedure article 821, which provides: "A post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty." When circumstantial evidence is used to prove the commission of the offense, Louisiana Revised Statute § 15:438 mandates, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." *State v. Neal*, 00-0674, p. 9 (La.6/29/01); 796 So.2d 649, 657, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002). This is not a separate test that applies instead of a sufficiency of the evidence test when circumstantial evidence forms the basis of the conviction. *State v. Cummings*, 95-1377, p. 4 (La.2/28/96); 668 So.2d 1132, 1134. Rather, all of the evidence, both direct and circumstantial, must be sufficient under *Jackson* to convince a rational juror the defendant is guilty beyond a reasonable doubt. It is not the function of the appellate court to assess credibility or reweigh the evidence. *Id.*

*State v. Dorsey*, 10-216, pp. 42-43 (La. 9/7/11), 74 So.3d 603, 633, *cert. denied*, __ U.S. __, 132 S.Ct. 1859 (2012).

Louisiana Revised Statutes 30:2076.2 provides, in pertinent part:

**B. Knowing violations.**

> (1) Any person who knowingly violates any provision of the Louisiana Pollutant Discharge Elimination System or any permit condition or limitation implementing any of such provisions in a permit issued under the Louisiana Pollutant Discharge Elimination System or any requirement imposed in a pretreatment program approved under the Louisiana Pollutant Discharge Elimination System; or

> . . . .

5

**F. Responsible corporate officer as "person".** For the purposes of this Section, the term "person" means an individual, corporation, partnership, association, state, municipality, commission, political subdivision of a state, any interstate body, or any responsible corporate officer.

In *U.S. v. Wilson*, 133 F.3d 251, 262-63 (4th Cir. 1997), the defendant was convicted of knowingly discharging fill material and excavated dirt into wetlands without a permit, a violation of 33 U.S.C.A. § 1319(c)(2)(A). The court held the Clean Water Act (CWA) required the government to prove the defendant's knowledge of facts meeting each essential element of the substantive offense but need not prove the defendant knew his conduct to be illegal. *See also U.S. v. Hopkins*, 53 F.3d 533, 540 (2d Cir. 1995), *cert. denied*, 516 U.S. 1072, 116 S.Ct. 773 (1996); *U.S. v. Sinskey*, 119 F.3d 712, 716-17 (8th Cir. 1997).

Louisiana Revised Statutes 30:2076.2 does not define the term responsible corporate officer. The term is found in La. Admin. Code tit. 33, pt. IX, § 2503, which sets forth who may sign a permit application under the LPDES program, and provides, in pertinent part:

A. Applications. All permit applications shall be signed as follows:

1. for a corporation by a responsible corporate officer. For the purpose of this Section, a responsible corporate officer means:

a. a president, secretary, treasurer, or vice-president of the corporation in charge of a principal business function, or any other person who performs similar policy- or decision-making functions for the corporation . . . .

The term is also found in the CWA, 33 U.S.C. § 1319(c)(6).[2] However, the term is not defined in the CWA either. The definition of responsible corporate officer, as set

---

[2] 33 U.S.C.A. § 1319(c)(6) states: "For the purpose of this subsection, the term 'person' means, in addition to the definition contained in section 1362(5) of this title, any responsible corporate officer." 33 U.S.C.A § 1362(5) states: "The term 'person' means an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body."

forth in the CWA, was discussed in *U.S. v. Iverson*, 162 F.3d 1015, 1022-25 (9th Cir. 1998) (footnotes omitted) (fourth to tenth, twelfth, sixteenth to twenty-second alterations in original) as follows:

> "When interpreting a statute, this court looks first to the words that Congress used." *Sanchez* [*v. Pacific Powder Co.*], 147 F.3d [1097] at 1099 [(9th Cir. 6/29/98)]. The CWA holds criminally liable "any person who . . . knowingly violates" its provisions. *See* 33 U.S.C. § 1319(c)(2). The CWA defines the term "person" to include "any responsible corporate officer." *See* 33 U.S.C. § 1319(c)(6) ("For the purpose of this subsection, the term 'person' means, in addition to the definition contained in section 1362(5) of this title, any responsible corporate officer."). However, the CWA does not define the term "responsible corporate officer."
>
> When a statute does not define a term, we generally interpret that term by employing the ordinary, contemporary, and common meaning of the words that Congress used. *See United States v. Akintobi*, 159 F.3d 401, 1998 WL 734386, at *2 (9th Cir.1998) ("In the absence of a statutory definition, words will be interpreted as taking their ordinary, contemporary, common meaning.") (citation and internal quotation marks omitted); *Leisnoi v. Stratman*, 154 F.3d 1062, 1069 (9th Cir.1998) (stating a similar rule). As pertinent here, the word "responsible" means "answerable" or "involving a degree of accountability." *Webster's Third New Int'l Dictionary* 1935 (unabridged ed. 1993). Using that meaning, "any corporate officer" who is "answerable" or "accountable" for the unlawful discharge is liable under the CWA.
>
> The history of "responsible corporate officer" liability supports the foregoing construction. The "responsible corporate officer" doctrine originated in a Supreme Court case interpreting the Federal Food, Drug, and Cosmetic Act (FFDCA), *United States v. Dotterweich*, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943). . . .
>
> In *Dotterweich*, the president and the general manager of a corporation each argued that he was not a "person" as that term is defined in the FFDCA. *See Dotterweich*, 320 U.S. at 278, 64 S.Ct. 134. The Court disagreed, holding that "[t]he offense is committed . . . by all who do have such a responsible share in the furtherance of the transaction which the statute outlaws." *Id.* at 284, 64 S.Ct. 134. The Court refused to define the boundaries of the doctrine, however, leaving the question for district courts and juries. *See id.* at 285, 64 S.Ct. 134 ("To attempt a formula embracing the variety of conduct whereby persons may responsibly contribute in furthering a transaction forbidden by an Act of Congress . . . would be mischievous futility. . . . For present purposes it suffices to say that in what the defense characterized as a very fair charge the District Court properly left the question of responsibility . . . to the

7

jury.") (internal quotation marks omitted). *See also Carolene Products Co. v. United States*, 140 F.2d 61, 66 (4th Cir.) ("There is ample authority in support of the principle that the directing heads of a corporation which is engaged in an unlawful business may be held criminally liable for the acts of subordinates done in the normal course of business, regardless of whether or not these directing heads personally supervised the particular acts done or were personally present at the time and place of the commission of these acts.") (citing *Dotterweich* ), *aff'd on other grounds*, 323 U.S. 18, 65 S.Ct. 1, 89 L.Ed. 15 (1944).

Because Congress used a similar definition of the term "person" in the CWA, we can presume that Congress intended that the principles of *Dotterweich* apply under the CWA. *See Long v. Director, Office of Workers' Compensation Programs*, 767 F.2d 1578, 1581 (9th Cir.1985) ("[W]hen a legislature borrows an already judicially interpreted phrase from an old statute to use it in a new statute, it is presumed that the legislature intends to adopt not merely the old phrase but the judicial construction of that phrase.") (citation and internal quotation marks omitted). *See also Bragdon v. Abbott*, 524 U.S. 624, [631], 118 S.Ct. 2196, 2202, 141 L.Ed.2d 540 (1998) ("Congress' repetition of a well-established term carries the implication that Congress intended the term to be construed in accordance with pre-existing . . . interpretations."). Under *Dotterweich*, whether defendant had sufficient "responsibility" over the discharges to be criminally liable would be a question for the jury.

After Congress initially enacted the CWA in 1972, the Supreme Court further defined the scope of the "responsible corporate officer" doctrine under the FFDCA. In *United States v. Park*, 421 U.S. 658, 668, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975), a corporate president argued that he could not be "responsible" under *Dotterweich*, because he had delegated decision-making control over the activity in question to a subordinate. *Id.* at 677, 95 S.Ct. 1903. The Court rejected that argument, holding that

> the Government establishes a prima facie case when it introduces evidence sufficient to warrant a finding by the trier of the facts that the defendant had, by reasons of his position in the corporation, responsibility and authority either to prevent in the first instance or promptly to correct, the violation complained of, and that he failed to do so.

*Id.* at 673-74, 95 S.Ct. 1903. Stated another way, the question for the jury is whether the corporate officer had "authority with respect to the conditions that formed the basis of the alleged violations." *Id.* at 674, 95 S.Ct. 1903. The Court did not, however, require the corporate officer actually to exercise any authority over the activity.

In 1987, after the Supreme Court decided *Park*, Congress revised and replaced the criminal provisions of the CWA. (Most importantly, Congress made a violation of the CWA a felony, rather than a misdemeanor.) In replacing the criminal provisions of the CWA, Congress made no changes to its "responsible corporate officer" provision. That being so, we can presume that Congress intended for *Park*'s refinement of the "responsible corporate officer" doctrine to apply under the CWA. *See, e.g.,* [*United States v.*] *Brittain*, 931 F.2d [1413] at 1419 [(10th Cir. 1991)] (citing *Park* under the CWA).

Moreover, this court has interpreted similar terms in other statutes consistently with the Court's decision in *Park*. For example, the Internal Revenue Code (IRC) holds liable any "person required to collect, truthfully account for, and pay over any tax" under the IRC. 26 U.S.C. § 6672(a). The IRC defines "person" to include any "officer . . . under a duty to perform the act in respect of which the violation occurs." 26 U.S.C. § 6671(b). This court consistently has interpreted the term "person" to include corporate officers with authority to pay taxes, whether or not they exercise that authority.

In *United States v. Graham*, 309 F.2d 210, 212 (9th Cir.1962), a member of the board of directors argued that he could not be a "person" as that term is used in 26 U.S.C. § 6671(b). This court rejected that argument, holding, instead:

> The statute's purpose is to permit the taxing authority to reach those responsible for the corporation's failure to pay the taxes which are owing. . . .
>
> The question is simply whether the board of directors had the final word as to what bills should or should not be paid, and when.

*Id.* (citation and internal quotation marks omitted).

More recently, in *Purcell v. United States*, 1 F.3d 932, 936 (9th Cir.1993), this court addressed a corporate president's argument that he was not a responsible "person" under the IRC, because he had delegated the actual decision-making to a subordinate. This court held:

> That an individual's day-to-day function in a given enterprise is unconnected to financial decision making or tax matters is irrelevant where that individual has the authority to pay or to order the payment of delinquent taxes. . . .
>
> . . . .
>
> [Thus] . . ., we conclude that an individual may be said to have had the final word as to what bills should or

9

> should not be paid if such individual had the authority required to exercise significant control over the corporation's financial affairs, regardless of whether he exercised such control in fact.

*Id.* at 937 (citation and internal quotation marks omitted). *See also Muck v. United States*, 3 F.3d 1378, 1380–81 (10th Cir.1993) ("Plaintiff argues that, because the day-to-day operations of Graystone were performed by a business manager who made the decisions about disbursal of funds, plaintiff is not a responsible party for purposes of the statute. . . . The existence of such authority, irrespective of whether that authority is actually exercised, is determinative. Liability is not confined to the person with the greatest control.") (citations omitted).

Taken together, the wording of the CWA, the Supreme Court's interpretations of the "responsible corporate officer" doctrine, and this court's interpretation of similar statutory requirements establish the contours of the "responsible corporate officer" doctrine under the CWA. Under the CWA, a person is a "responsible corporate officer" if the person has authority to exercise control over the corporation's activity that is causing the discharges. There is no requirement that the officer in fact exercise such authority or that the corporation expressly vest a duty in the officer to oversee the activity.

Brignac testified that Jones was advised of the testing required and other conditions contained in the various permits by letter. Brignac also testified that all DMRs and exceedance notifications were signed by Jones as president or chairman of the board. Additionally, multiple letters were sent by LDEQ to Jones regarding expired permits. Further, all correspondence received from PDC was in Jones' name.

Keith Bates, a criminal investigator with LDEQ, and Brignac interviewed Jones on December 9, 2009. During the interview, Jones stated that litigation in the Nineteenth Judicial District over funds being delivered to him by the USDA created a situation where DMRs were not being submitted, and the deficiencies that had been detected by Brignac and civil inspectors were the result of insufficient funds, and "he uh . . . that they had taken sole responsibility for those deficiencies due to that." Bates testified that Jones also admitted that one of the reasons he stopped submitting DMRs was because sampling showed exceedances and it was difficult to address those.

10

Jones also told Bates that PDC took sole responsibility for the lack of repairs in the day-to-day operations of the company. Jones subsequently admitted that he knew the failure to submit DMRs was a violation of the permits.

Bates testified that Jones stated he had contracted with MD Enterprises, and that company was responsible for the upkeep of the treatment facilities, "the pumps more than anything."[3] Bates testified that Jones was not willing to volunteer information regarding the contract or allow him or Brignac to see a copy of it. Bates interviewed Margaret Doucet, who admitted she was responsible for the upkeep of the pumps located at the treatment facilities.

Bates and Brignac spoke with Jones again on January 22 and February 18, 2010. Jones assisted LDEQ when search warrants were executed at his home and at PDC.

**Arguments**

Jones contends the permits for the six subdivisions at issue were in the name of PDC. He alleges there was no evidence to show that he personally did anything to cause the effluent limitations to be exceeded, that he caused PDC not to submit quarterly DMRs, that he caused or discharged a substance into the waters of the State without an appropriate permit, or that he personally operated and maintained the facilities and systems in the subdivisions. Therefore, Jones argues that he can only be responsible if the evidence proved beyond a reasonable doubt that he was a responsible corporate officer of PDC.

Jones contends that all exhibits filed into evidence by the State that were signed by him were dated no later than November 2007. He admits that letters were sent to him after November 2007 by LDEQ, and certain forms listed him as the contact party;

---

[3]There was no testimony regarding when this contract was entered into.

11

however, he argues those documents are not proof that he was a responsible corporate officer at the time of the offenses. Jones asserts that statements he made that he had no DMRs and that PDC was responsible did not make him a responsible corporate officer. Jones further asserts there was no evidence that he was still the president, chairman of the board, or otherwise responsible for the actions or inactions of PDC after November 2007. Accordingly, he asserts his convictions as to counts 2, 3, 5, 6, 8, 9, 11, 13, and 15 should be reversed.

Jones and PDC contend there was no testimony that the discharge from the East Side Subdivision after the permit expired was into the waters of the State. Additionally, there was testimony that the discharge from the North Mamou Subdivision after the permit had expired was into Bayou des Cannes, which was a waterway of the state. Jones and PDC argue that other testimony indicated the discharge was into Grand Louis Bayou then into Bayou Nezpique, without subsequent testimony regarding whether they were waterways of the State.

The State contends Jones conceded there was sufficient evidence in the record proving beyond a reasonable doubt that he was guilty of counts 1, 4, 7, 10, 12, and 14. The State argues that Jones' claim that the evidence was insufficient to prove his culpability after November 2007 seems disingenuous given the statements made by him when questioning witnesses at trial. The State cites to the following portion of Jones' closing argument to the jury: "I've stated before and it has been stated in the record many times that I am Joseph Jones, President, Chairman of the Board of Plaisance Development Corporation, a community development corporation." The State also cites the following portion of Jones' cross-examination of Brignac:

> Q. The evidence. . .let me rephrase. There was [sic] some letters that said I was Chairman of the Board?

12

A. Yes sir.

Q. There was [sic] some letters that said I was President?

A. Correct, yes sir.

Q. There was [sic] some that I signed as uh...DMRs, the person in charge of the DMRs?

A. Correct. You signed the letters for the Discharge Monitoring Reports, yes.

Q. Okay. That's...that's all I wanted to get at that there were many uh...uh...positions or things that I had to do. Uh...you mentioned that um...I held a law degree and uh...account[ing] degree.

The State also cites a portion of the affidavit of probable cause and arrest warrant for Jones, which was signed on February 12, 2010.

Jones, in a reply brief, contends the State erred in its assertion that he conceded there was evidence in the record to prove beyond a reasonable doubt that he was guilty of counts 1, 4, 7, 10, 12, and 14. Jones argues the statements made by him and pointed out by the State do not address when he might have been an officer of PDC. Further, those statements were made by him in the representation of himself in either opening statements or the questioning of witness and are, thus, not evidence. Jones argues that solely because an investigator listed him as the responsible party and/or contact person for PDC does not show that he was, in fact, a responsible corporate officer.

**Analysis**

JONES

All permit applications, DMRs, exceedance notifications, and correspondence from PDC discussed at trial and filed into evidence were signed by Jones no later than November 21, 2007. After 2007, LDEQ sent correspondence addressed to Jones and PDC on September 26, 2008, informing them that a permit was being issued for the

Poor Boy Subdivision. On May 20, 2009, LDEQ sent a letter addressed to Jones and PDC stating the permits for the North Mamou, Theophile, and Kennedy Subdivisions had expired. LDEQ sent second notices addressed to Jones and PDC regarding the same subdivisions on July 28, 2009.

John Fontenot conducted inspections at the Theophile, Kennedy, and East Side Subdivisions on December 12, 2008. His report for the Theophile Subdivision listed Jones as the contact person, his report for the Kennedy Subdivision listed Jones as the contact person and the facility representative, and his report for the East Side Subdivision listed Jones as the contact person, and Jones signed as receiving the field interview form completed by John for the East Side Subdivision. John was not asked why he listed Jones as the contact person for PDC.

Ricky Fontenot conducted an inspection of the Poor Boy Subdivision on April 27, 2009. Ricky's report listed Jones as the contact person for the Poor Boy Subdivision. The report also indicated Jones was contacted and was unable to provide lab analyses or DMRs. Ricky's report further indicated he returned to PDC's office on May 7, 2009, to review the requested records, and Jones did not have the records. Ricky's report for June 5, 2009, listed the contact person for Poor Boy Subdivision as Jones, and the report stated he was contacted. The report additionally stated Jones was unable to provide lab analyses or DMRs. Ricky was not asked why he listed Jones as the contact person for PDC.

Ricky Fontenot also conducted an inspection of the North Mamou Subdivision on November 16, 2009. Ricky's report listed the contact person for the North Mamou Subdivision as Jones. The report stated Jones was contacted on November 23, 2009, and records requested from him. The report also indicated that, at the time of the inspection, Jones was not able to provide DMRs. The report further stated Jones said

14

he was in the process of looking for a contract lab to take samples. Ricky was not asked why he listed Jones as the contact person for PDC.

Jones represented himself at trial, and during the cross-examination of Brignac, he brought out the fact that he had signed letters as chairman of the board and president and had signed DMRs. Additionally, during his closing argument, Jones stated: "I've stated before and it has been stated in the record many times that I am Joseph Jones, President, Chairman of the Board of Plaisance Development Corporation, a community development corporation."

In *State v. Trahan*, 11-1609, pp. 9-10 (La. 7/2/12), __ So.3d __, the supreme court stated the following regarding statements by counsel during closing arguments:

> Jurors were therefore entitled at the close of the evidence to hold the defense accountable for its failure to introduce any evidence in support of the hypothesis of innocence proposed by defense counsel, apart from the coroner's vague statement in response to questioning by the defense that he understood some sort of altercation had occurred earlier on the day of the shooting, a detail far more helpful to the state than the defense because it provided the only evidence of motive in the case. Jurors were also entitled to consider the direct evidence defendant provided in her admission to the 9–1–1 operator that she had shot the victim and to the first responders that the victim's body and the gun were still inside the house, the source for defense counsel's own judicial admission in his opening and closing remarks that defendant had killed the victim with the gun found by the police in the residence. *See Martinez v. Bally's Louisiana, Inc.,* 244 F.3d 474, 477 (5th Cir.2001) ("Although a judicial admission is not itself evidence, it has the effect of withdrawing a fact from contention."); *United States v. Blood*, 806 F.2d 1218, 1221 (4th Cir.1986) ("Generally, statements by an attorney concerning a matter within his employment may be admissible against the retaining client. Further, a clear and unambiguous admission of fact made by a party's attorney in an opening statement in a civil or criminal case is binding upon the party."); *United States v. McKeon*, 738 F.2d 26, 30 (2nd Cir.1984) ("An admission by a defense attorney in his opening statement in a criminal trial has . . . been held to eliminate the need for further proof on a given element of an offense.") (citation omitted); *Hall v. Wal–Mart Stores East, LP*, 447 F.Supp.2d 604, 608 (W.D.Va.2006) ("Though case law on the issue is scarce, the principle that an admission of counsel during trial 'may dispense with proof of facts for which witnesses would otherwise be called' has been recognized by the Supreme Court since 1880.") (citing *Oscanyan v. Arms Co.*, 103 U.S.

261, 263, 26 L.Ed. 539, 541 (1880) ("The power of the court to act in the disposition of a trial upon facts conceded by counsel is as plain as its power to act upon the evidence produced.")).

. . . Thus, viewed in the light most favorable to the prosecution, the evidence at trial, as shaped by the admissions of fact made by defendant on the scene and by the judicial admissions of defense counsel in his opening and closing statements, established that the victim died from a single shot fired at close range, less than four feet, by a high-powered hand gun as he stood bent over the wash basin in the bathroom, a stance the state's blood spatter expert found entirely consistent with the apparent upward trajectory of the bullet as it traveled through the victim's body and exited his left shoulder into the bathroom wall.

Even if the remarks by Jones during his closing argument were considered an admission, Jones did not state when he was president and chairman of the board or that he had *always* been or had been the *only* president and chairman of the board of PDC. The evidence presented by the State proves that Jones was the president and chairman of the board until November 21, 2007, and that he prepared DMRs and notices of exceedance.

In *Carney's Restaurant, Inc. v. State*, 933 N.Y.S.2d 120 (N.Y.A.D. 3 Dept., 2011), a case involving civil penalties, Robert Carney was the sole shareholder, officer, and director of Carney's Restaurant, Inc. Carney obtained a permit in 1993 to install a septic system for the restaurant that would discharge effluent into the surface waters of a tributary of Ballston Lake. The permit contained effluent limitations and monitoring requirements. Petitioners challenged the Department of Environmental Conservation's (DEC) finding that they violated the Environmental Conservation Law and its permit.

The court found the record reflected that, as sole officer and shareholder of the restaurant, Carney was the sole individual personally and directly responsible for making decisions regarding the restaurant's sewage disposal system, was the named permittee for the permit, and was the individual responsible for filing discharge

16

monitoring reports.  The record further showed that Carney knew about the septic system failures and did not comply with repeated requests by DEC to replace it.  He also knew about the effluent limits and the repeated violations of those limits and did not take action to remedy them.  Finally, Carney admitted that he repeatedly failed to comply with the consent orders and offered no plausible excuse for his failures.  The court found there was substantial evidence to support DEC's determination that Carney was personally liable for the permit violations, the illegal discharge of wastewater after the permit had been revoked, and the failure to take any corrective action as set forth in the consent orders.

In *U.S. v. Hong*, 242 F.3d 528 (4th Cir. 2001), *cert. denied*, 534 U.S. 823, 122 S.Ct. 60 (2001), the defendant was charged with thirteen counts of negligently violating pretreatment requirements under the CWA because employees discharged untreated wastewater directly into the sewer system in violation of the company's discharge permit.  The court found that Hong avoided formal association with the company and was not identified as an officer.  However, he had purchased the wastewater treatment facility, operated it under a different company name, moved the operations to a new facility, controlled the company's finances, and played a substantial role in its operations, including arranging for a lease for the facility, participating in the purchase of the wastewater treatment system, reviewing marketing reports, urging employees to make the company successful through the use of various marketing strategies, controlling the payment of various expenses, and maintaining an office at the facility.  The court found the evidence was sufficient to establish that Hong was a responsible corporate officer.  The court rejected the argument that he had to be designated as a corporate officer, stating:  "The gravamen of liability as a responsible corporate officer is not one's corporate title or lack thereof; rather, the

17

pertinent question is whether the defendant bore such a relationship to the corporation that was appropriate to hold him criminally liable for failing to prevent the charged violations of the CWA." *Id.* at 531 (footnote omitted).

The correspondence from LDEQ addressed to Jones after November 21, 2007, and the listing of Jones as a contact person for or owner of PDC by LDEQ employees on reports or field interview forms are not sufficient to prove beyond a reasonable doubt that Jones was a responsible corporate officer of PDC after November 21, 2007. There was no testimony regarding Jones' duties and responsibilities at PDC after November 21, 2007, and there was no testimony regarding the corporate structure of PDC during the time period at issue. Additionally, no officer, employee, or customer of PDC was called to testify in this matter. Furthermore, there was no testimony that Jones personally committed any of the offenses that occurred after November 21, 2007.

Based on *Hong*, 242 F.3d 528, it appears that one must look to the actual authority and power a person holds rather than his title or lack thereof. Because the State failed to prove Jones' status as a responsible corporate officer or that he personally committed any of the acts that occurred after November 21, 2007, beyond a reasonable doubt, the State failed to prove the elements of the following offenses as to Jones: 1) count 2 - failed to submit DMRs quarterly between December 2007 and March 2009, for the North Mamou Subdivision; 2) count 3 - knowingly discharged any substance into the waters of the state without the appropriate permit on November 16, 2009, from the North Mamou Subdivision; 3) count 6 - knowingly did not properly operate and maintain the treatment facilities at the Theophile Subdivision on December 12, 2008; 4) count 8 - knowingly discharged any substance into the waters of the state without the appropriate permit on March 20, 2010, from the Theophile

Subdivision; 5) count 9 - knowingly did not properly operate and maintain the treatment facilities at the Kennedy Subdivision on December 12, 2008; 6) count 11 - knowingly discharged any substance into the waters of the state without the appropriate permit on November 16, 2009, from the Kennedy Subdivision; 7) count 13 - knowingly did not submit DMRs quarterly for the Poor Boy Subdivision between July 2008 and December 2009; and 8) count 15 - knowingly discharged any substance into the waters of the state without the appropriate permit on December 12, 2008, November 16, 2009, and May 12, 2010, from the East Side Subdivision.

> When the evidence does not support a conviction of the crime charged, the Court has generally remanded with instructions to discharge the defendant. See *State v. Allien*, 366 So.2d 1308 (La.1978). However, the discharge of the defendant is neither necessary or proper when the evidence does support a conviction on a lesser and included offense which was a legislatively authorized responsive verdict. See *State v. Tillman*, 356 So.2d 1376, n. 2 at 1379 (La.1978).

*State v. Byrd*, 385 So.2d 248, 251 (La.1980).

The trial court instructed the jury that negligent violations of the LPDES were responsive verdicts to the charged offenses of knowing violations of the LPDES. In *U.S. v. Pruett*, 681 F.3d 232, 242 (5th Cir. 2012)(alteration in original), the court stated: "Section 1319(c)(1)(A) refers explicitly to 'negligent' violations of the CWA. Negligence is not an ambiguous term, and is understood to mean '[t]he failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation.' Black's Law Dictionary 1061 (8th ed.2004)."

Because the State failed to prove Jones was a responsible corporate officer, that he committed the acts, or had a duty regarding the acts constituting the offenses that occurred after November 21, 2007, the State cannot prove Jones committed a negligent violation of the LPDES. Therefore, Jones' convictions and sentences for counts 2, 3, 6, 8, 9, 11, 13, and 15 are vacated and his sentences set aside.

The Court will now review the sufficiency of the evidence regarding the offenses committed prior to November 21, 2007.

In *Pruett*, 681 F.3d 232, Pruett was the president and chief executive officer of Louisiana Land and Water Co. (LLWC) and LWC Management Co., Inc. (LWC Management). Pruett, through LLWC and LWC Management, was responsible for operating twenty-eight wastewater treatment facilities in northern Louisiana. After discovering violations at many of the facilities, the government initiated a criminal prosecution against Pruett, LLWC, and LWC Management. Appellants were convicted for discharging pollutants in excess of the effluent limitations set forth in their National Pollutant Discharge Elimination System permit. On appeal, the appellants argued the government did not produce sufficient evidence of their intent regarding this conviction.

The court stated the following when addressing this issue:

In *United States v. Greuling,* No. 95–50705, 1996 WL 460109 (5th Cir. Aug.1, 1996), we found sufficient evidence to support a factory owner's conviction under 33 U.S.C. § 1319(c)(2)(A) for knowingly discharging pollutants into a city sewer system. There, the government had presented evidence of Greuling's substantial experience in the industry, his knowledge of inadequate factory conditions, the repeated citations and reports of excess discharges at the factory, and his failure to allocate money to repair the factory. *Id.* at *2–3. Similar evidence exists here. Pruett worked in the industry since 1986 and was familiar with his permit obligations. The government presented evidence demonstrating that the effluent violations at Love Estates were constant up to and including the period charged in the indictment (a period of approximately four years).[3] At some points, the discharges at Love Estates were double or triple the levels allowed by the permit. The government also introduced testimony from an inspector that Pruett had installed an unorthodox makeshift measure (an old rail car) at the Love Estates facility, even though Pruett knew that the rail car was not authorized for water treatment purposes.

In light of this evidence, which we must view in the light most favorable to the prosecution, we find that a rational trier of fact could have found beyond a reasonable doubt that Appellants knowingly violated the permit limitations at Love Estates. Therefore, there was sufficient evidence to support the Appellants' convictions on Count 13.

_____

   [3]In contrast, mere temporary noncompliance would be considered an "upset," and not evidence of a knowing violation. *See* 40 C.F.R. § 122.41(n)(1). A demonstration of an "upset" "constitutes an affirmative defense to an action brought for noncompliance" if certain conditions are met. *Id.* § 122.41(n)(2).

*Id.* at 239.

In *U.S. v. CPS Chemical Co., Inc.*, 779 F.Supp. 437, 442-43 (E.D. Ark. 11/12/91)(citations omitted), the court stated:

> For enforcement purposes, a permittee's DMRs constitute admissions regarding the levels of effluents that the permittee has discharged. The DMRs may be used to establish the permittee's liability under the Act by showing that the permittee has exceeded its NPDES permit limitations. Accordingly, courts have granted summary judgment on the issue of liability based on a reading of a defendant's DMRs.

Count 1 charged that Jones knowingly exceeded the effluent limitations at the North Mamou Subdivision between January 1, 2007, and November 2007. LDEQ issued a permit for the North Mamou Subdivision, which became effective on March 15, 2004. Killeen and Brignac testified the permit called for sampling once a month, testing for BOD, TSS, and fecal coliform, and DMRs to be submitted quarterly. The effluent limitations were exceeded in testing conducted from January through November 2007. The exceedance notification forms pertaining to testing dates of January 16, February 13, March 13, April 10, May 8, September 18, October 16, and November 13, 2007, were sent to LDEQ. Jones signed those forms. The test results for the months at issue were also set forth in DMRs, which were signed by Jones in his capacity as president of PDC.

Based on the evidence presented and the cases cited herein, it is clear that the State proved that Jones was aware of the numerous exceedances of the effluent limitations set forth in the permit for the North Mamou Subdivision and failed to take

any steps to correct the violations, as evidenced by the failure to note remedial action on the exceedance notifications he signed. Thus, the State proved beyond a reasonable doubt that Jones knowingly exceeded the effluent limitations in the North Mamou Subdivision permit between January 1, 2007, and November 2007.

Count 4 charged that Jones knowingly exceeded the effluent limitations at the Bye the Way Subdivision between January and October 2007. LDEQ issued a permit to Bye the Way Subdivision, which became effective on August 1, 2003. The permit required sampling just as that for the North Mamou Subdivision and for the filing of DMRs. PDC filed exceedance notifications on February 5, February 22, March 30, April 30, June 25, October 7, and November 15, 2007. The forms were signed by Jones. Additionally, Jones signed DMRs evidencing the results of testing for April, May, June, July, August, and September 2007. Based on this evidence, the State proved that Jones was aware of the numerous exceedances of the effluent limitations set forth in the permit for Bye the Way Subdivision and failed to take any steps to correct the violations, as evidenced by the failure to note remedial action on the exceedance notifications he signed. Thus, the State proved beyond a reasonable doubt that Jones knowingly exceeded the effluent limitations in the Bye the Way Subdivision permit between January and October 2007.

Count 5 charged that Jones knowingly failed to submit DMRs quarterly for the Bye the Way Subdivision between November 2007 and March 2009. Brignac testified that he found no DMRs submitted by Bye the Way Subdivision between November 2007 and August 1, 2008. Jones signed DMRs for East Side Subdivision on November 21, 2007. Testing was performed at the North Mamou Subdivision on November 13, 2007, and a notice of exceedance prepared on November 21, 2007, and signed by Jones. Thus, Jones was actively working for PDC and preparing DMRs in

November 2007.  The State proved beyond a reasonable doubt that Jones knowingly failed to submit a DMR for the Bye the Way Subdivision in November 2007.

Count 7 charged that Jones knowingly failed to submit DMRs quarterly for the Theophile Subdivision between January 2007 and February 2009.  LDEQ issued a permit to the Theophile Subdivision, which became effective on March 15, 2004.  The permit required sampling and the filing of DMRs.  Brignac testified that he found no DMRs that were submitted by PDC between January 2007 and March 2009.  Based on the filing of DMRs for the other subdivisions owned by PDC and Jones' failure to file any DMRs during the time period at issue for the Theophile Subdivision, the State proved beyond a reasonable doubt that Jones knowingly failed to submit DMRs for the Theophile Subdivision between January and November 2007.

Count 10 charged that Jones knowingly failed to submit DMRs quarterly for the Kennedy Subdivision between January 2007 and March 2009.  LDEQ issued a permit to the Kennedy Subdivision, which became effective on March 15, 2004.  The permit required sampling and the filing of DMRs.  LDEQ sent a letter to Jones and PDC on January 29, 2007, informing them that the facility failed to submit DMRs as required by its permit.  A letter, which was signed by Jones, was sent to LDEQ on February 23, 2007.  In that letter, PDC apologized for its failure to file reports in a timely manner.  Based on PDC's letter to LDEQ on February 23, 2007,  it is clear Jones was aware that DMRs had to be filed and his failure to do the same violated the Kennedy Subdivision's permit.  Accordingly, the State proved beyond a reasonable doubt that Jones knowingly failed to submit DMRs for the Kennedy Subdivision between January 2007 and November 2007.

Count 12 charged that Jones knowingly failed to properly operate and maintain the Poor Boy Subdivision treatment facility on August 3, 2007.  LDEQ issued a

permit to the Poor Boy Subdivision, which expired on February 29, 2008. Thus, the treatment facility had a valid permit on August 3, 2007. According to the permit, it was incumbent upon the permittee to properly operate and maintain the treatment facility.

Miller testified that on August 3, 2007, the pond's levees were overgrown, there was no chlorine in the chlorine contact chamber, and the discharge was brown to green in color. Additionally, there were exceedances for BOD and fecal coliform during the first quarter of 2007. Brignac testified that proper operation and maintenance of the treatment facility called for levees to be kept free and clear of trees and shrubs. Killeen testified that an empty chlorine contact chamber was an operation and maintenance violation.

At the time Miller inspected the facility, Broussard, a representative of PDC, arrived at the treatment facility. There was no testimony that Broussard reported the events to Jones, as Broussard was not called to testify. There was no testimony regarding Jones' authority or control over the operation and maintenance of the treatment facilities other than his act of signing DMRs and exceedance notifications. Accordingly, the State failed to prove beyond a reasonable doubt that Jones knowingly failed to properly operate and maintain the Poor Boy Subdivision treatment facility on August 3, 2007.

The trial court instructed the jury that negligent violations of the LPDES were responsive verdicts to the charged offenses of knowing violations of the LPDES.

The evidence presented by the State indicates Jones was president and chairman of the board on and prior to August 3, 2007, and he had power and authority to prepare and sign DMRs and exceedance notifications. The State presented no evidence that Jones had any authority over the operation and maintenance of the Poor

24

Boy Subdivision treatment facility or that of any of the other treatment facilities. Accordingly, Jones' conviction for count 12 is vacated and his sentence set aside.

Count 14 charged that Jones knowingly exceeded the effluent limitations at the East Side Subdivision between January 2007 and May 2008. LDEQ issued a permit to East Side Subdivision, which became effective on August 1, 2003. The permit required sampling and the filing of DMRs. Jones signed DMRs and exceedance notifications that were filed from January 1, 2007, through November 21, 2007. Exceedance notifications were prepared for tests conducted on January 15, February 12, March 12, April 9, May 9, June 13, September 12, and October 10, 2007. Based on this evidence, the State proved beyond a reasonable doubt that Jones was aware of the numerous exceedances of the effluent limitations set forth in the permit for East Side Subdivision and failed to take any steps to correct the violations, as evidenced by the failure to note remedial action on the exceedance notifications he signed. Thus, the State proved beyond a reasonable doubt that Jones knowingly exceeded the effluent limitations in the East Side Subdivision permit between January 1, 2007, and November 21, 2007.

In summary, counts 1, 4, 5, 7, 10, and 14 are affirmed, and counts 2, 3, 6, 8, 9, 11, 12, 13, and 15 are reversed, and the sentences for those counts set aside.

PDC

PDC contests the sufficiency of the evidence of two counts relating to discharges into the waters of the State without a permit. The State asserts that for purposes of the Louisiana Water Control Law, waters of the State are defined in La.R.S. 30:2073(7) as follows:

> "Waters of the state" means both the surface and underground waters within the state of Louisiana including all rivers, streams, lakes, groundwaters, and all other water courses and waters within the confines

of the state, and all bordering waters and the Gulf of Mexico. However, for purposes of the Louisiana Pollutant Discharge Elimination System, "waters of the state" means all surface waters within the state of Louisiana and, on the coastline of Louisiana and the Gulf of Mexico, all surface waters extending therefrom three miles into the Gulf of Mexico. For purposes of the Louisiana Pollutant Discharge Elimination System, this includes all surface waters which are subject to the ebb and flow of the tide, lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, natural ponds, impoundments of waters within the state of Louisiana otherwise defined as "waters of the United States" in 40 CFR 122.2, and tributaries of all such waters. "Waters of the state" does not include waste treatment systems, including treatment ponds or lagoons designed to meet the requirements of the Clean Water Act, 33 U.S.C. 1251 et seq.

The State also cites *Matter of McGowan*, 533 So.2d 999 (La.App. 1 Cir. 1988), *writ denied*, 537 So.2d 1168 (La.1989), *cert. denied*, 493 U.S. 822, 110 S.Ct. 80 (1989). Therein, a compliance order was issued to McGowan, as owner and operator of the DeVilbis, Kratzer, and Taylor production leases, for the discharge of oil field wastes and failure to notify DEQ of the discharge. In one assignment of error, McGowan argued that oil spill and salt water discharges did not enter waters of the State as defined under the Environmental Quality Act.

Salt water was discharged from a salt water pit located on the DeVilbis site. The salt water exited the pit through a bleeder pipe and open valve which exited the east levee of the pit and extended fifty yards to the edge of a storm water drainage ditch on the DeVilbis site. The drainage ditch entered Gum Gully Canal which flowed into Bayou Chene and comprised part of the Inercoastal-Mermentau-Lacassine Basin. Also, ten barrels of oil spilled over the containment wall at the Taylor site and traveled 200 yards through a drainage ditch. The flow was diverted from the ditch and traveled easterly into a cow pasture for 350 feet. The oil flow was diverted from the ditch by McGowan in order to prevent it from flowing through the remaining sixty feet of the ditch and into Gum Gully Canal.

In analyzing McGowan's claim, the court stated:

> Unless specifically excepted by permit, the Louisiana Water Quality Standards apply to intermittent streams which may be dry during dry weather conditions, and to man-made water courses such as ditches or canals created specifically for drainage or water conveyance. Louisiana Water Quality Standards §§ V and VIII. The ditches or depressions in question convey storm water runoff from the lease sites to Gum Gully Canal into the Mermentau River Basin. Pollutants entering the ditches will generally be received by larger bodies of water.
>
> From a reading of the purpose and policy of the Louisiana Water Control Law, Louisiana Water Quality Standards (V) and (VIII), and the statutory and regulatory definitions of "waters of the state" and "surface water", the drainage ditches into which the oil and salt water were discharged constitute "waters of the state" within the meaning of the Environmental Quality Act.

*Id.* at 1003.

Count 3 charged that PDC knowingly discharged any substance into the waters of the State without the appropriate permit on November 16, 2009, from the North Mamou Subdivision. The permit for the North Mamou Subdivision expired on March 15, 2009. LDEQ notified PDC by letter dated May 20, 2009, that the permit had expired. A second notice was sent by letter dated July 28, 2009. A discharge from the treatment facility was observed by Brignac on November 15, 2009. Photographs of the discharge were admitted into evidence. Brignac testified that the discharge went from a roadside ditch to a Parish lateral and then into Bayou Des Cannes, which Brignac testified was a waterway of the State. Brignac later testified that the discharge flowed into an unnamed ditch, into an unnamed canal, to Grand Louis Bayou, then to Bayou Nezpique, and into a subsegment of the Mermentau River Basin. Brignac did not testify that Grand Louis Bayou, Bayou Nezpique, or the Mermentau River Basin were waters of the State.

Count 15 charged that PDC knowingly discharged any substance into the waters of the State without the appropriate permit on December 12, 2008, November

16, 2009, and May 12, 2010, from the East Side Subdivision. The permit for the East Side Subdivision expired on August 1, 2008.[4] Discharges were noted by John Fontenot on December 12, 2008, and Brignac on November 16, 2009, and May 12, 2010. The State presented no testimony regarding the flow of discharge from the East Side Subdivision. However, the East Side Subdivision's permit indicated that discharge flowed from the treatment facility into a local drainage ditch then into Bayou Grand Louis in subsegment 060210 of the Vermillion-Teche Basin. Additionally, photographs depicted the discharge location.

There was testimony that a permit was required to discharge wastewater into the waters of the State. PDC obtained permits for the North Mamou and East Side Subdivisions. Those permits expired. Based on the fact that PDC initially obtained permits, an indication that the discharge was into the waters of the State, and the finding in *McGowan* that drainage ditches are waters of the State, the State proved beyond a reasonable doubt that PDC discharged into the waters of the State from the North Mamou and East Side Subdivisions without a valid permit. Accordingly, PDC's convictions for counts 3 and 15 are affirmed.

## ERRONEOUS AND EXCESSIVE SENTENCES

In the first assignment of error, PDC contends its sentences are erroneous and excessive, and Jones contends his sentences are excessive.

PDC

PDC contends the trial court should not have sentenced it to a term of imprisonment, as corporations cannot serve terms of imprisonment. PDC also contends its sentences are excessive. PDC was sentenced to serve two years at hard labor on each of the fifteen counts, which were suspended, and it was placed on five

---

[4]No letters informing PDC that the permit had expired were admitted into evidence at trial.

years active supervised probation on each count. PDC was also ordered to pay a fine of $150,000.00 on each count and court costs of $5,000.00. All sentences, fines, costs, and probationary periods were to run concurrently.

In *Melrose Distillers, Inc. v. U.S.*, 359 U.S. 271, 274, 79 S.Ct. 763, 766 (1959), a case involving the prosecution of two corporations under the Sherman Anti-Trust Act, the Supreme Court stated the following: "As the Court of Appeals noted, a corporation cannot be sent to jail. The discharge of its liabilities whether criminal or civil can be effected only by the payment of money." *See also U.S. v. P. F. Collier & Son Corp.*, 208 F.2d 936 ( 7th Cir. 1953); *U.S. v. Rivera*, 912 F.Supp. 634 (D. Puerto Rico 1996); *Tarlton v. State*, 93 S.W.3d 168 (Tex. App. Houston 14 Dist. 2002); *Flomo v. Firestone Nat. Rubber Co., LLC*, 643 F.3d 1013 (7th Cir. 2011).

Because a corporation cannot be sentenced to a term of imprisonment, all fifteen of PDC's sentences are vacated and the matter remanded to the trial court for resentencing.

JONES

Jones contends his sentences are excessive. This court has set out the following standard to be used in reviewing excessive sentence claims:

> La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784

29

(La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

*State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331(alteration in original).

In deciding whether a sentence shocks one's sense of justice or makes no meaningful contribution to acceptable penal goals, this court has held:

> [An] appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. *State v. Smith*, 99-0606 (La.7/6/00), 766 So.2d 501. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La.5/31/96), 674 So.2d 957, 958.

*State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061.

Jones' convictions for counts 1, 4, 5, 7, 10, and 14 are affirmed. This Court will review the excessiveness of those sentences. The sentencing range for the offenses at issue is a fine of not less than $5,000.00 nor more than $50,000.00 per day of violation or imprisonment for not more than three years, with or without hard labor, or both, on each court. La.R.S. 30:2076.2(B)(3).

Counts 1, 4, and 14 are convictions for exceeding the effluent limitations at the North Mamou, Bye the Way, and East Side Subdivisions. On each count, Jones was sentenced to two years at hard labor with all but nine months suspended, five years active supervised probation upon release from incarceration, a fine of $20,000.00, and court costs of $500.00. The sentences, fines, costs, and probationary periods for counts 1, 4, and 14 were ordered to run concurrently. Counts 5, 7, and 10 are

convictions for failing to submit DMRs quarterly for the Bye the Way, Theophile, and

Kennedy Subdivisions. On each count, Jones was sentenced to two years at hard

labor with all but nine months suspended, five years active supervised probation upon

release from incarceration, a fine of $20,000.00, and court costs of $500.00. The

sentences, fines, costs, and probationary periods for counts 5, 7, and 10 were ordered

to run concurrently. The sentences, fines, and costs with regard to each of the two

categories of offenses were ordered to run consecutively; however, all probationary

periods were ordered to run concurrently.

At the sentencing hearing, the trial court stated the following:

In arriving at a sentence, the Court has carefully considered the records investigation report, the sentencing memoranda filed by the parties, the statements and evidence provided at sentencing hearing, and all of the sentencing guidelines of Louisiana Code of Criminal Procedure Article 894.1. Specifically, the Court considered the fact the defendant blatantly, knowingly, and continually failed to operate several waste treatment facilities which resulted in the discharge of potentially dangerous and harmful substances into the ditches, streams, and waters of the Parish of Evangeline and the State of Louisiana. These actions persisted despite warnings and actions on behalf of the State. These actions and/or omissions were also in direct violation and breach of the trust of the citizens who occupied homes in the subdivisions affected. It is further noted that Mr. Jones is a law graduate and a pastor of two churches which would tend to negate an assertion that he was not capable of understanding the ramifications of his actions or omissions. The Court also notes that at the last minute prior to sentencing, now Mr. Jones has presented the Court with an agreement to sell these treatment facilities. While I welcome that action, it's a little bit late. It should have been a long time ago, but at the last minute as Mr. Jones seems to be prone to do, he works at the last possible second. But it is a good move. It is also the finding of this Court that lesser or completely probated sentences would deprecate the seriousness of the defendant's crimes.

The trial court then sentenced Jones. Jones argues that he is:

a first-time, non-violent offender, who led an entirely law abiding life prior to the time period of these charges. He does not and did not pose an unusual risk of danger to the public. The conduct is unlikely to occur since PDC has sold the sewerage systems to WTSO LLC (R. 1189, 1203 - 1204). He has a high potential for rehabilitation. He did not receive the benefit of a plea bargain. The crimes of which he was convicted were the result of a single course of conduct. Imprisonment would cause

31

excessive hardship to Jones and his wife. No other state court has imposed as severe a sentence as originally received herein by Jones for the crimes of which he was convicted. The sentences he received are grossly disproportionate to the crimes of which he was convicted, and are excessive.

The exemplary character, community service and history of Jones, both before and after the offense, make a sentence of probation reasonable. Jones has already had several harsh sanctions imposed upon him as a result of his arrest, charging, and conviction for this offense.

In his reply brief, Jones asserts his sentences should have been imposed concurrently rather than consecutively.

The State asserts Jones' sentences are not excessive. In support of this argument, the State cites *Pruett*, 681 F.3d 232. Pruett was convicted of knowingly violating the CWA and sentenced to twenty-one months incarceration for a felony conviction and to twelve months for a misdemeanor conviction, with the sentences to run concurrently. Pruett was also ordered to pay fines of $310,000.00, $300,000.00, and $240,000.00. On appeal, Pruett argued the trial court erred in applying a sentencing enhancement because he held a position of trust. *Pruett* is distinguishable from the case at bar because Jones' sentences have not been enhanced.

The State also asserts Jones' sentences are not excessive because the trial court ordered that they run consecutively. The State notes that the trial court retains discretion to impose consecutive penalties.

The trial court was aware of the circumstances surrounding the offenses and Jones' background at the time the sentences were imposed. There are no cases arising in state court in Louisiana to compare Jones' sentences to. Additionally, the only case set forth in 33 U.S.C.A. §1319 is *Pruett*.

Louisiana Code of Criminal Procedure Article 883 provides for concurrent and consecutive sentences, in pertinent part, as follows:

If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently.

In *State v. Patterson*, 11-892 (La.App. 3 Cir. 2/1/12), 83 So.3d 1209, *writ denied*, 12-526 (La. 6/1/12), 90 So.3d 435, the defendant was convicted of five counts of distribution of methamphetamine and sentenced to five years at hard labor on each count to run consecutively. On appeal, the defendant argued his sentences were excessive. This court stated the following when addressing his claim:

Sentences for multiple offenses "constituting parts of a common scheme or plan . . . shall be served concurrently unless the court expressly directs that some or all be served consecutively." La.Code Crim.P. art. 883. The trial judge determined Defendant's five offenses constituted a pattern or lifestyle. He expressly directed the five terms to run consecutively, satisfying the exception of La.Code Crim.P. art. 883.

This court has previously held that imposing consecutive sentence[s] for offenses occurring on separate dates and under different circumstances did not constitute an abuse of discretion. *State v. Baker*, 08-54 (La.App. 3 Cir. 5/7/08), 986 So.2d 682. The fifth circuit has held that consecutive sentences are indicated for offenses occurring on different dates and locations. *State v. Wilson*, 99-105 (La.App. 5 Cir. 7/27/99), 742 So.2d 957, *writ denied*, 99-2583 (La.2/11/00), 754 So.2d 935. The fifth circuit has applied this holding to distribution of cocaine occurring on different days. *State v. Dillon*, 01-906 (La.App. 5 Cir. 2/26/02), 812 So.2d 770, *writ denied*, 02-1189 (La.4/21/03), 841 So.2d 779.

*State v. Chaisson*, 09-119, p. 28 (La.App. 3 Cir. 10/7/09), 20 So.3d 1166, 1184.

*Id.* at 1221(alterations in original).

Jones is a first offender and could have received a sentence of zero to three years on each count. He was sentenced to two years on each count with all but nine months of each sentence suspended. Because the trial court ordered the sentences for

each count to run concurrently but the sentences for each of the two categories of offenses to run consecutively, Jones will serve a maximum of eighteen months in prison and be on probation for five years.

The court finds the trial court sufficiently articulated a basis for the sentences imposed and did not abuse its discretion based on the nature of the offenses committed, the legislative purpose behind the statute, and Jones' repeated noncompliance with the permits issued by LDEQ. This court does not find that Jones' sentences are excessive.

## ASSIGNMENT OF ERRORS NUMBER THREE AND FIVE

In the third assignment of error, Jones and PDC contend the trial court failed to instruct the jury on the definition of responsible corporate officer. In the fifth assignment of error, PDC contends the evidence was not sufficient to prove it had a corporate existence.

According to Uniform Rules—Courts of Appeal, Rule 2-12.4, all specifications or assignments of error must be briefed or they may be considered abandoned. Jones and PDC failed to brief these assignments of error; thus, these assignments of error are deemed abandoned.

## ASSIGNMENT OF ERROR NUMBER SIX

In the sixth assignment of error, Jones contends the trial court erred in not granting a continuance of the trial. On August 18, 2011, the State and counsel for LDEQ and PDC announced they were ready to proceed to trial, which was scheduled for August 29, 2011. However, defense counsel, Elbert Guillory, was not present. Jones informed the trial court, "I'm ready to go to trial. I'm innocent, and uh . . . I look forward to my day in Court." Jones continued, "If I have to go get the files from him and look over the files and represent myself, I'll do that, Your Honor."

34

Jones filed a "Notice of Change in Representation" on August 25, 2011. Therein, Jones asserted Mr. Guillory failed to show up at the pre-trial hearing held on August 18, 2001, and a prior occasion. Additionally, by mutual agreement, Mr. Guillory would not be handing the case, and Jones would be representing himself. Jones additionally asserted he needed files regarding the owners of the treatment facilities and could not prepare a defense until he had received files from Mr. Guillory and the attorney for LDEQ. Jones then asked that trial be rescheduled so that he could prepare.

A hearing on Jones' motion was held on August 26, 2011. At the hearing, the trial court noted the bill of information was filed on June 24, 2010, and during the pendency of the case, Jones had been represented by Mr. Claiborne then Mr. Guillory. Additionally, the matter had been continued twice. Jones indicated he expected Mr. Guillory to be present and present a defense, and he was told he had none. Jones indicated he had spoken to Mr. Guillory the previous day, as that was the only day Jones had the chance to speak to him. When asked what good it would do to continue trial, Jones stated the following:

> I'm gonna [sic] have the ability to call witnesses. I'm gonna [sic] subpoena witnesses, put on a defense. Mr. Daniels just told me he hadn't given all the files over to Mr. Dupre and to Mr. Guillory, so I asked him to give me what he didn't give them. Give me the files, and I'll collect the files from what he's already given to Mr. Guillory. That way, I'll have all the files. But I can't go to Court, and he hasn't given me the files.

Jones further stated he would like to depose Brignac regarding a conversation Brignac had with a witness. Jones' request for a continuance was denied.

On August 29, 2011, Jones reurged his motion to continue. He asserted he needed time to prepare a defense. The trial court noted that Jones' prior attorney, Mr. Guillory, was present and urged Jones to reconsider his decision to release Mr.

Guillory. Mr. Guillory stated he was prepared to proceed to trial and he had had full discovery. Jones asserted that Mr. Guillory was not there when he needed him and the two never spoke about a defense. Jones then stated he was ready to represent himself but not ready to proceed to trial.

Mr. Daniels, the attorney for LDEQ, stated that discovery had been provided to Jones. Mr. Daniels further stated the following:

> Additionally, last Friday or Thursday, I'm losing track of time. . . . When I came here, I went over every one of those counts and these binders with Mr. Dupre and Mr. Jones. So, for him to say that he doesn't have any idea what evidence's [sic] against him is simple false. I went through every page. Mr. Dupre took pages of notes. Mr. Jones...In fact, Mr. Jones said, "This isn't necessary," and he wanted to leave. And Mr. Dupre said, "No, you're gonna [sic] stay and see and hear all this." So, these binders you see, last Thursday I went through every one of those binders page by page with Mr. Dupre and Mr. Jones. So, he knows exactly what the evidence against him is.

Mr. Dupre informed the trial court that Mr. Daniels was correct. The trial court subsequently stated the matter would be proceeding to trial.

In *State v. Manning*, 03-1982, p. 30 (La. 10/19/04), 885 So.2d 1044, 1077, *cert. denied*, 544 U.S. 967, 125 S.Ct. 1745 (2005), the supreme court stated:

> We have consistently held that the decision whether to grant or refuse a motion for a continuance rests within the sound discretion of the trial judge, and a reviewing court will not disturb such a determination absent a clear abuse of discretion. [*State v.*] *Bourque*, 622 So.2d [198] at 225 [(La.1993)]; *see* LA.CODE CRIM. PROC. ANN. art. 712. In addition, this Court generally declines to reverse convictions even on a showing of an improper denial of a motion for a continuance absent a showing of specific prejudice. *Bourque*, 622 So.2d at 225; *State v. Champion*, 412 So.2d 1048, 1051 (La.1982).

Jones argues that he was not prepared to proceed to trial. He asserts a review of the trial transcript reveals he did not have copies of documents the State introduced into evidence. He argues that it was obvious that not having the documents in his

possession prior to trial was extremely prejudicial, as he did not have the documents to prepare for cross-examination and to determine the extent of the State's evidence.

Jones made no showing that he could have presented a better defense had he been given more time to prepare for trial. *See State v. Malinda*, 95-292 (La.App. 5 Cir. 10/31/95), 663 So.2d 882. Additionally, "[t]he generic claim of inadequate time to review is not a showing of specific prejudice." *State v. Franklin*, 43,173, p. 22 (La.App. 2 Cir. 9/17/08), 996 So.2d 387, 400, *writ denied*, 08-2371 (La. 5/22/09), 9 So.3d 138. For these reasons, the Court finds that the trial court did not abuse its discretion when denying Jones' request for a continuance. This assignment of error lacks merit.

## ERRORS PATENT

After reviewing the record, we find the minutes of sentencing are in need of correction. The minutes of Jones' and PDC's sentencing proceeding indicate that the fine and costs on all of the counts were imposed as special conditions of probation. However, the transcript of the sentencing proceeding reflects that the trial court, on each count, imposed the fine and costs as part of the principal sentence. "[I]t is well settled that when the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62. Because this court is affirming, the sentences for Jones' convictions in counts 1, 4, 5, 7, 10, and 14, the trial court is instructed to amend the sentencing minutes of Jones to accurately reflect the sentencing transcript. However, due to the fact that the sentences imposed on Jones in counts 2, 3, 6, 8, 9, 11, 12, 13, and 15 are vacated and the sentences imposed on PDC are vacated, no correction is needed for the sentencing minutes as to these sentences.

Additionally, the minute entry of Jones' sentencing proceeding fails to set forth some of the conditions of probation imposed by the trial court on Jones at sentencing. The sentencing transcript reflects the trial court stated in pertinent part:

> Now, Mr. Jones, part of your sentence has been suspended. For you not to go to prison and serve all of this time, you'll have to comply with these conditions of probation. You have to refrain from all criminal conduct; pay a supervision fee of $60.00 per month; make a full and truthful report at the end of each month, and report to your probation officer as directed; permit the probation officer to visit you at your home or elsewhere; devote yourself to an approved employment or occupation; refrain from owning or possessing firearms or other dangerous weapons; refrain from frequenting unlawful or disreputable places or consorting with disreputable persons; remain within the jurisdiction of the Court, and get the permission of the probation officer before making any change in your address or your employment; submit yourself to an available medical, psychiatric, mental health, or substance abuse examination or treatment or both when deemed appropriate and ordered to do so by the probation and parole officer.

Thus, the trial court is instructed to amend Jones' minutes of sentencing to reflect these conditions of probation imposed by the trial court.

**DECREE**

<u>JONES</u>

This court affirms Jones' convictions on counts 1, 4, 5, 7, 10, and 14. His sentences on those counts are affirmed. The trial court is instructed to amend the minutes to accurately reflect the transcript of sentencing.

Jones' convictions on counts 2, 3, 6, 8, 9, 11, 12, 13, and 15 are reversed and the sentences for those counts set aside.

<u>PDC</u>

PDC's convictions are affirmed. However, its sentences are set aside and the matter remanded for resentencing for the reasons set forth in this opinion.

**JOSEPH JONES: REVERSED IN PART; AFFIRMED IN PART AND REMANDED.**

**PLAISANCE DEVELOPMENT CORPORATION: CONVICTIONS AFFIRMED; SENTENCES SET ASIDE AND REMANDED.**